UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **JACK MILLER, ET AL,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Cause No. 5:20-cv-00642-JKP-RBF** |
| | § | |
| **JOSEPH SALVAGGIO, ET AL** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

---

**PLAINTIFF'S THIRD AMENDED COMPLAINT AND JURY DEMAND**

---

NOW COME Plaintiffs, JACK MILLER, ANNABEL CAMPBELL, MATTHEW PAESINA, LISA PESINA, M.P., and J.G., by and through their attorneys, for their Complaint against Defendants, respectfully alleges the following:

**JURISDICTION AND VENUE**

1.      This is a civil action for money damages brought pursuant to 42 U.S.C. § 1983, and the First and Fourth Amendments to the United States Constitution.

2.      This Court has original jurisdiction over Plaintiffs' claims presented in this Complaint based upon the laws of the United States pursuant to 28 U.S.C.  §§ 1331 and 1343.

3.      The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest, costs, and attorney fees.

4.      The unlawful actions alleged in this Complaint took place within the jurisdiction of the United States Western District of Texas, San Antonio Division.

1

5.     Venue is appropriate in the Western District of Texas, San Antonio division pursuant to 28 U.S.C. § 1391(b) since the Individual Defendants are residents of Western Texas and the acts providing the legal basis for this Complaint occurred in the City of Leon Valley, County of Bexar, State of Texas.

## PARTIES

6.     The Plaintiffs, **Jack Miller, Annabel Campbell, Matthew Pesina, Lisa Pesina, M.P., and J.G**., at all pertinent times were residents of the City of Leon Valley, the State of Texas, and citizens of the United States.

7.     Defendant and former Police Chief **Joseph Salvaggio** ("Defendant Salvaggio"), was the chief of police of Leon Valley.  He has demonstrated a practice of disdain and outright disregard for individuals' constitutional rights. Defendant Salvaggio has a history of unlawfully and unconstitutionally using the powers with which he has been entrusted as a law enforcement officer and more specifically as a chief of police, to squash his dissidents, including those whose dissidence is constitutionally protected. At all times relevant Defendant Salvaggio was acting under the color of law.

8.     Defendant and former Leon Valley Captain **Ruben Saucedo** ("Defendant Saucedo"), at all times relevant, was employed as a police captain and acting under color of state law as a law enforcement officer.

9.     Defendant and former Lieutenant **David Anderson** ("Defendant Anderson"), at all times relevant, was employed as a police lieutenant and acting under color of state law as a law enforcement officer.

10.     Defendant Sergeant **Eddie Gonzales** ("Defendant Gonzales"), at all times relevant, was employed as a police sergeant and acting under color of state law as a law enforcement officer.

2

11.     Defendant Detective **Terry Brooks** ("Defendant Brooks"), at all times relevant, was employed as a detective and acting under color of state law as a law enforcement officer.

12.     Defendant Detective **Alex King** ("Defendant King"), all times relevant, was employed as a detective and acting under color of state law as a law enforcement officer.

13.     Defendant Detective **Rudolfo Munoz** ("Defendant Munoz"), all times relevant, was employed as a detective and acting under color of state law as a law enforcement officer.

14.     Defendant Detective **Jim Wells** ("Defendant Wells"), at all times relevant, was employed as a detective and acting under color of state law as a law enforcement officer.

15.     Defendant Officer **Ronnie Michael Tacquard** ("Defendant Tacquard"), at all times relevant, was employed as a police officer and acting under color of state law as a law enforcement officer.

16.     Defendant Officer **Erika Rivera** ("Defendant Rivera"), all times relevant, was employed as a police officer and acting under color of state law as a law enforcement officer.

17.     Defendant Officer **Johnny Vasquez** ("Defendant Vasquez"), at all times relevant, was employed as a police officer and acting under color of state law as a law enforcement officer.

18.     Defendant Officer **Andy Griego** ("Defendant Griego"), at all times relevant, was employed as a police officer and acting under color of state law as a law enforcement officer.

19.     The individual Defendants are sued in their individual capacity.  Upon information and belief, all the individually named Defendant Officers, at all relevant times, are citizens of the United States, were law enforcement officers within the jurisdiction of the County of Bexar and were employed by the City of Leon Valley.

20.     On or about May 31, 2018, at the time of the events alleged in this Complaint, all the individually named Defendants were always each acting in their individual capacities, within

3

the course and scope of their employment as police officers and/or agents employed by the City of Leon Valley, and under the color of law.

## FACTUAL BACKGROUND

21.     This suit involves two military veterans and former law enforcement officers, both of whom worked for departments in the Bexar County area back in the 1990s and 2000s.  One honorably resigned from his sheriff's department because of debilitating injuries previously sustained in a multi-vehicle collision.   The other officer resigned from two separate police departments following scandal—once, following allegations that he cheated on his Captain's exam; the second, following events that occurred in this suit and others.  The first officer is Plaintiff Jack Miller; the second, is Defendant Joseph Salvaggio.

22.     Plaintiff Jack Miller learned many things during his time working for the Bexar County and Travis County Sheriff's Offices.  One was, as one deputy watching the other deputies and officers around him, that not all cops are good; a second, cops can and do lie.

23.     Following his time in law enforcement, Plaintiff Miller took his passion for protecting the public in a different direction; these days Plaintiff Miller uses his experience, once

 as a sheriff and now as a member of the public, to educate police officers and the public on how to interact with each other without hurting anyone, violating anyone's rights, or breaking any laws while exercising the rights they both have.  These lessons occur in-person on the ground and online through his social media pages.  Plaintiff Miller also posts videos of interactions he has and of news or laws he wants to share about on his TXSHEEPDOG72 vlogs posted on different online platforms.  Plaintiff Miller also uses his platform to decry any abuses of power he uncovers.

4

24.     In May of 2018, Plaintiff Miller learned that the Leon Valley mixed-use municipal building had Texas Penal Code 30.06 and 30.07 signs posted on their building.  Plaintiff Miller decided to visit the building to educate the police officers there on proper signage, to inform these police officers that they had posted the wrong signage according to Texas Government Code, Section 411.209, and to see if he could persuade them to take down and replace these signs with the proper signage.  In doing so, he entered an imbroglio larger than he could have ever imagined.

**A. First Amendment Auditors and Second Amendment Auditors**

25.     Late April 2018, an individual that goes by "Mexican Padilla," a vlogger who films public officials—including police officers—while they fulfill their public duties, was filming at and around the Bexar County Tax Assessor's office on Bandera.  Individuals bothered by his



presence called the Bexar County Constable's office for Precinct 2.  Then Constable—now convicted felon—Michelle Barrientes Vela and then Captain—now, currently indicted, and pending trial—Marc Garcia made the scene, where they immediately demanded this YouTuber stop filming and identify himself.  When he refused, citing his constitutional and state rights, they arrested him.

26.     Following his release from this questionable arrest, Mexican Padilla continued filming public officials in their official capacities and posting his videos online.  He elected to film at the Leon Valley Municipal Building on May 2, 2018.  While filming around the inside of the public areas of the building, Mexican Padilla asked



a city employee about an area past a closed door.  The city employee told him it was the admin wing and it was also open to the public.  Believing this city employee's representations, Mexican Padilla entered the quiet area of city hall and continued live streaming.

27.    Thirty seconds after he entered, Defendant Salvaggio approached him, asking him



if he needed help.  When Mexican Padilla told him he did not need assistance, Defendant Salvaggio informed him it was a restricted area,[1] demanded to know why he was there and demanded he leave.  The situation escalated, and, after placing his hands on Mexican Padilla several times failed to convince him to leave, Defendant Salvaggio informed him he was under arrest.



Defendant Salvaggio then tackled him before placing him in handcuffs. Mexican Padilla was charged with Criminally Trespassing – Private Property, Resisting Arrest, Harassment, and Harassment of a Public Servant; both harassment charges were later dismissed.  Mexican Padilla's online followers who had been watching the live stream, understandably outraged, began calling the City of Leon Valley and Leon Valley Police Department to complain about the Chief's actions.

28.    Within an hour, then-Constable Vela, aware of Mexican Padilla's live stream publicly posted online, showed up at the Leon Valley Police Department with several of her



---

[1] The City of Leon Valley later added "Restricted Area: Authorized Personnel Only" signs to these doors following Mexican Padilla's Leon Valley visit.

officers, Chief Deputy Anthony Castillo and Captain Marc Garcia.  This currently indicted, former Constable began telling Defendant Salvaggio ideas about two groups, the "First Amendment Auditors" and "Second Amendment Auditors."   According to Vela, this motley collection of amateur journalists, political activists, cop watchers (individuals like Mexican Padilla who film public officials performing their official duties as a means of holding them accountable to the public), and protestors from across the country were not individuals with their own agendas, motivations, plans, and goals, but, rather, were members of two similar and frequently united cabals—structured, and possibly criminal, organizations created for the sole purpose of harassing innocent police officers and disrupting law enforcement function.  Vela also showed him pictures of specific individuals she had come to believe—following her encounter with Mexican Padilla— were members of these esoteric groups.   Without more, Defendant Salvaggio believed and wholeheartedly accepted this incredible conspiracy theory.

29.    At 8:03 P.M. that night (May 2, 2018), Defendant Salvaggio emailed various leaders from around Bexar County to inform them that a "1st Amendment Auditor" had visited Leon Valley PD that day and had "abus[ed] [their] staff for approximately 18 minutes" before finding his way into a restricted area where he was subsequently arrested.  Defendant Salvaggio informed these leaders that "his group (from across the world)" had been calling and emailing the police department since the arrest, and he offered to discuss the incident at the Alamo Area Police Chiefs Association's (AAPCA) monthly meeting the next day.

30.    The next day, at the AAPCA monthly meeting, Defendant Salvaggio described to his fellow police chiefs his encounter with Mexican Padilla and again espoused the now-disgraced constable's outlandish speculations about organized groups of anarchists determined to irritate law enforcement personnel.  Other police chiefs started talking about their own encounters with various

vloggers and political activists in the Bexar County area.  Many of these law enforcement agencies, uncomfortable with being subjected to the public eye, had tried to charge these journalists and activists with crimes to compel them to stop.  Many of these flimsy charges were rejected by Bexar County District Attorney's office.  These police chiefs wanted the DA's office to provide them with counsel on how to rid themselves of these allegedly-organized groups who expressed and exercised their First and/or Second Amendment rights in ways these police chiefs and their officers found irritating. The DA's office agreed to host a meeting with police representatives the next day.

31.     Following this meeting, at 9:48 PM that night, the Southwest Texas Fusion Center (SWTFC), a multi-agency fusion center run by the San Antonio Police Department that focuses on stopping criminal and terrorist activity, released a Situational Awareness Bulletin regarding "1st & 2nd Amendment Auditor Tactics" that alleged "so called '1st and 2nd Amendment Auditors' . . . are private citizens that engage in activities that include confronting Law Enforcement Officers, berating them with verbal attacks, refusing to identify themselves, oftentimes refusing to obey lawful orders, and video taping [sic] the encounters before uploading them on social media platforms. The following individuals have seemingly joined forces. . . ." The bolo then gave the names, dates of birth, and usernames for five local vloggers, amateur journalists, internet personalities, and/or political activists including Plaintiff Jack Miller.

32.     On May 4, 2018, interested police chiefs from the local area, along with representatives from the FBI, met with members of the District Attorney's office to discuss different criminal charges for individuals of these alleged groups that they had prior run-ins with. For several hours, the DA's office explained to these various sheriffs, constables, and police chiefs what criteria needed to be met for specific criminal charges; the DA's office also explained what information they needed to see before they would agree to prosecute a case.  Defendant Salvaggio

took this meeting as confirmation that these two alleged groups existed, that they were full of criminals who lacked any respect for the stately dignity of the law, and that any of these anarchists who tried to subvert the law in his city (by showing up and peacefully filming how the city government operates) needed to be brought to heel.

33.     The next day, Defendant Salvaggio instructed his lieutenant over the Criminal Investigation Department (CID), Defendant Anderson, to create packets for every Leon Valley police department officer, detective, and administrative aide, along with the Leon Valley receptionists and municipal court staff.  With this email, Defendant Salvaggio included a copy of two documents. One, the SWTFC bulletin on "1st and 2nd Amendment Auditor Tactics," and, two, a 2017 bulletin from the San Antonio field office for ICE's Enforcement and Removal Operations Intelligence Operation Unit regarding investigative reporters who refuse to identify themselves and try to educate police officers while filming.[2]  Those two documents identified 11 different individuals, including Plaintiff Miller.

34.     Defendant Salvaggio instructed Defendant Anderson to create individual sheets featuring a prominent picture and personal information, including their full name, any aliases, date of birth, full address, work address, email address, and Facebook username.  Defendant Salvaggio asked that the font be "large enough to easily be seen if being filmed."  All photos Defendant Anderson needed Defendant Salvaggio had already found and placed in his box.  These packets

---

[2] This particular 7-page bulletin alleged local, local "civil rights auditors" were an organized group known as the South Central Auditors of Texas (SCAT) (a name used by several of these independent journalists to describe specific collaborative projects) who film police officers and/or hold peaceful protests, who complain or press charges if officers violate their rights, and who publicly post these videos on YouTube.  The bulletin then provided names, usernames, dates of birth, driver's license numbers, addresses, vehicle information, and photos for 7 online personalities, vloggers, amateur journalists, and/or political activists—including Plaintiff Jack Miller—along with photos and usernames for two additional vloggers, and/or amateur journalists.

were intended to be carried by officers on patrol and available for admin staff to reference at their desk.  Defendant Salvaggio further instructed Defendant Anderson to send them to Chief Al Ballew for AAPCA, to Alamo Area Council of Governments (AACOG) Paul Buske, the moderator for the Alamo Area Regional Information and Intelligence Sharing (AARIIS) Network,[3] and to the San Antonio Reginal Intelligence Center (SARIC) operated by the San Antonio Police Department.

35.     Defendant Salvaggio implemented a policy, which was directed throughout the Leon Valley Police Department, that every individual with a camera that purported to be a vlogger needed to be identified and removed from Leon Valley city property.

36.     These packets and policy could only have one intended purpose: to intimidate individuals protected by the Constitution of the United States of America and the First Amendment.  LVPD wanted every YouTuber their officers or staff encountered, along with their entire online following, to know that LVPD not only knew all about their public personas, but also about their private lives.  Defendant Salvaggio specifically requested that the information in the packets include where each amateur journalist worked and where their families lived.  Defendant Salvaggio further insisted this personal information be "large enough to easily be seen if being filmed."  Defendant Salvaggio wanted this threat to be clearly understood: If I perceive you coming after us professionally, I will come after you personally.  Individuals—in any capacity—who film LVPD officers are not welcome in the City of Leon Valley.  Defendant Salvaggio fully intended to use intimidation tactics to deter the free speech of anyone who attempted to film or photograph for any reason his police department and/or police officers.

---

[3] The AARISS network is a criminal justice program hosted by the AACOG Public Safety Division.

37.    On May 8, 2018, Defendant Anderson completed and signed off on a criminal trespass notice form for Mexican Padilla.  The criminal trespass applied to the Leon Valley Police Department and City Hall located at 6400 El Verde, the Fire Department at 6300 El Verde, the Library at 6425 Evers Road, the Community and Conference Center at 6427 Evers Road, and the Public Works Department at 6429 Evers Road.  If Mexican Padilla stepped foot on any of these properties belonging to the City of Leon Valley, he would be subject to arrest.

38.    On May 9, 2018, Mexican Padilla returned to the Leon Valley Municipal Building with a camera crew from Univision, a Spanish-speaking news station, and requested a complaint form.  He and an amateur journalist (Blacklab3l Copwatch, a vlogger who "highlight[s] specific cases of State-monopolized police misconduct that are otherwise ignored by traditional media outlets") filmed the event.   Within twenty seconds, then Lieutenant—now Police Chief—David Gonzalez with LVPD had placed him under arrest.  When Mexican Padilla tried to hand his phone to a friend nearby, Defendant Wells snatched it from his hand.  Defendants Saucedo and Anderson were also present nearby.  Mexican Padilla was charged with Criminally Trespassing.

39.    In the month that followed, other individuals who had seen these videos posted online, came to the Leon Valley Municipal Building to investigate the situation themselves; others came to peacefully protest.  Many filmed their visits.  Defendant Salvaggio believed these individuals were all part of his perceived-criminal organization, the "First Amendment Auditors."

11

40.     When Defendant Salvaggio's previous plans to intimidate these citizen journalists into staying out of Leon Valley entirely failed, he came up with a new plan, courtesy of Plaintiff Jack Miller's optimism.

**B. Trespass by License Holder – Section 30.06 and 30.07 Signs**

41.     While watching a video posted online from Mexican Padilla's visit to the Leon Valley Municipal Building, Plaintiff Miller noticed that the Leon Valley Municipal Building had posted Section 30.06 and 30.07 signs prohibiting openly carried and concealed carried handguns inside the building.  Knowing that a city cannot prohibit handguns on government property by using Section 30.06 and 30.07 signs,[4] Plaintiff Miller, a Bexar County native, decided to visit the Leon Valley Municipal Building to educate the city and/or its police officers on proper signage and to submit a complaint form, according to Texas Government Code, Section 411.209(d), if they did not agree to take down their signs.

42.     On May 31, 2018, at about 3:44 P.M., Plaintiff Miller visited the Leon Valley Municipal Building.  Attached to his hip was a holstered black training prop designed to look like a handgun.  He and a friend were filming his visit for their safety.

---

[4] A city can be fined $1,000-$1,500 the first time they post these signs and $10,000-$10,500 for each subsequent offense.  Each day of a continuing violation constitutes a separate violation. Tex. Govt. Code Sec. 411.209.

43.    When Plaintiff Miller entered the Leon Valley Municipal Building, he asked

Defendant Rivera what was included in the building. 
Defendant Rivera saw Miller's fake handgun
holstered on his hip, and never indicated that he was
not allowed to be where he was standing with the fake
gun. Defendant Rivera, recognizing that Miller was
not breaking any laws, informed him the building

housed city hall, the police department, the city manager, animal control, and the municipal court.

After confirming that the building was not just a courthouse, Plaintiff Miller asked to speak with

someone to report the violation of the posted Section 30.06 and 30.07 signs. Rivera required Miller

to stand to the side and wait, which he did, while she brought Defendant Wells over to speak with

him. Miller did not walk through the checkpoint, and he was not required to wait outside. Rivera

knew that Miller had not walked into any court-controlled area.

44.    Plaintiff Miller explained the situation to Defendant Wells and asked him to take

the signs down. He also told Defendant Wells that he would submit a complaint to the Office of



the Attorney General (OAG) if Leon Valley decided to leave them up. Defendant Wells refused

to take the complaint and required Miller to step outside with his fake gun. Defendant Tacquard

held open the first door for them as they exited the building at about 3:46 P.M.  Once outside,

Defendant Wells forbade Plaintiff Miller from entering any portion of City Hall again with his gun

because it was a court day.  He also told him to contact the OAG's office, and Leon Valley would

deal with them.  Defendant Wells refused to take the signs down, wished Plaintiff Miller a good

day, and walked off.



45.     After watching Defendant Wells walk off to the parking lot, Plaintiff Miller turned

around and saw Defendant Anderson standing in the door to the building.  Defendant Anderson

 had been informed by Leon Valley Criminal Investigations

Division (CID) Sergeant Eddie Gonzales of Plaintiff Miller's

visit and was waiting to speak with him.  Plaintiff Miller asked

Defendant Anderson if he was an official willing to talk.

Defendant Anderson agreed, and they both shook hands.

14

Defendant Anderson then told Plaintiff Miller that he was "allowed to practice [his] First Amendment right until [his] ears bleed."

46.     Plaintiff Miller informed Defendant Anderson that he was not here for that.  He then explained to him about the Section 30.06 and 30.07 signs.  While Plaintiff Miller was explaining, Defendant Anderson interrupted him to tell him he would not argue the law with him and to contact the Attorney General's office.  Plaintiff Miller asked if Leon Valley could look at the law themselves when someone had the time.  Defendant Anderson insisted that he believed Leon Valley was in compliance with the law and that they were entitled to post those signs because the building was also used as a courthouse.  He then informed Plaintiff Miller that he would not give him a confrontation, to have a good day, and to not block the entrance.  While Plaintiff Miller protested that he was not there to provoke a confrontation, Defendant Anderson walked back inside.

47.     While Defendant Wells had been speaking with Plaintiff Miller outside, Defendant Rivera had informed Defendant Tacquard that "members of the group 'Audit' were . . . being contacted by [O]fficer Jim Wells."  Defendant Tacquard proceeded to watch the interactions between Plaintiff Miller and Defendants Wells and Anderson from inside the building.  He was joined by Defendant E. Gonzales.

48.     Once Plaintiff Miller moved away from the front of the building, Defendants Anderson, CID Sergeant Eddie Gonzales, Tacquard, and Rivera huddled together to discuss their next steps.



49.     Neither Defendant Anderson, Defendant Wells, Defendant Tacquard, or Defendant Rivera appeared concerned about the presence of Plaintiff

Miller's handgun or acted as if they believed him to be an actual threat to security.  None of them escorted him away from the doors to the building.  None of them examined his prop weapon or performed any other investigations.  None of them arrested him on site for stepping just inside the Leon Valley Municipal Building wearing a supposed handgun.  Rather, upon information and belief, they were more concerned about him belonging to a so-called "Auditor" group and felt that his supposed membership with this alleged group was the real threat.

50.     While Defendant Officers discussed his visit inside, Plaintiff Miller returned to his car to store his prop handgun; he then returned to the municipal building.  As Plaintiff Miller approached the building, the four Defendant Officers scattered, trying to act casual.  Defendant Rivera resumed her security post.  Defendants Anderson and Tacquard took up positions throughout the entry hall, and Defendant E. Gonzales stood in the side hallway near Defendant Rivera, partially hidden by the wall.

51.     At about 3:51 P.M., after re-entering the building, Plaintiff Miller was wanded by Defendant Rivera who was performing security checks at the door.  Once Defendant Rivera cleared him to enter the building, he approached the front desk to ask the receptionist for a complaint form. While filling out the form, Plaintiff Miller informed Defendant Rivera—and by proximity Defendant E. Gonzales, who was lurking in the side hall, and Defendant Tacquard, who standing on the other side of the foyer's double doors—that he does not endorse Mexican Padilla's actions; he was just there because he saw the signs on the door.  Plaintiff Jack Miller also told these officers that he wanted to give them the opportunity "to shine."

52.     When Defendant Captain Saucedo, who had been informed of Plaintiff Miller's presence by Defendant Anderson, appeared in the lobby at about 3:54 P.M., Plaintiff Miller

informed him that he was not there to "do First Amendment stuff or create problems."  Defendant

Saucedo acknowledged this statement.

53.     Six minutes after Plaintiff Miller entered the building the second time, at about 3:57

P.M., while he was standing quietly filling out his complaint form at the front counter and politely

chatting with the receptionist, he informed his friend that he had received a text message that

LVPD was already discussing potentially arresting him for entering the building with an alleged

gun.  Plaintiff Miller informed his friend, the Leon Valley receptionist, and Defendant Rivera, that

if LVPD chose to arrest him, once they searched his vehicle, they'd discover that his so-called

weapon was really a rubber gun, and perhaps then they would be willing to finally listen to him.

54.     While the unarmed Plaintiff Miller filmed himself completing his complaint form,

at about 4:01 P.M., Defendant Detective Brooks meandered into the lobby and took up a position

leaning against the side counter of the receptionist's desk.   A minute after his arrival, the

receptionist, who had been working on her computer, immediately stopped what she was doing

and promptly packed up her belongings, and then, in the middle of a busy court day, left the

receptionist's desk unmanned for the remainder of Plaintiff Miller's visit.

55.     At about 4:06 P.M., Defendant Brooks left his post.  He returned at about 4:10 P.M.

and, per orders given him by Defendant Anderson, casually set a body camera on a nearby tabletop

and focused its camera on Plaintiff Miller.  He then resumed standing nearby, leaning against the

side of the front counter.  Defendant Anderson joined Defendant Brooks standing at the side and

quietly asked him if they had been able to identify Plaintiff Miller, yet.  Defendant Brooks told

Defendant Anderson that they were looking him up right then, but he knew that Plaintiff Miller

was included on the sheet.  He was not sure what Plaintiff's Miller name was or where he had

placed that flyer, but he was confident that Plaintiff Miller was on it.

56.     Seeing the two officers quietly conferring on the side, Plaintiff Miller, who had just finished completing his complaint form, asked them, "Are you guys out here for this?"  Defendant Brooks, who had just set up a camera to record Plaintiff Miller, claimed he was out there for the court, but Defendant Anderson asked him what it was.  Plaintiff Miller explained the form to him. While Plaintiff Miller tried to explain what information he had provided on the complaint form, Defendant Anderson told him, "Go ahead and try to solicit your confrontation.  Go ahead."  When Plaintiff Miller informed Defendant Anderson that he usually did not get a problem from police, Defendant Anderson denied giving him a problem and insisted he was there to take his complaint. When Plaintiff Miller pointed out that Defendant Anderson had been confrontational from the very beginning, Defendant Anderson interrupted him and demanded he tell him his complaint, because he was a busy man.  Plaintiff Miller informed Defendant Anderson that if he was too busy, he would find someone else.  Defendant Anderson claimed he was here to handle it, but then immediately informed Plaintiff Miller, again, "I'm not going to give you a confrontation. Promise."  When Plaintiff Miller asked him to stop, Defendant Anderson told him that that was what he wanted.  When Plaintiff Miller again asked him to stop, Defendant Anderson informed him that he had his complaint, took the filled-out form from off of the counter, and walked away. Plaintiff Miller insisted that Defendant Anderson return his form; he would find another officer to discuss it with.  Plaintiff Miller also asked Defendant Anderson for his name.  Defendant Anderson provided it, but Plaintiff Miller was unable to hear it.  He asked Defendant Anderson to repeat it, but Defendant Anderson refused several times, even when Plaintiff Miller introduced himself and told Defendant Anderson that he did not remember hearing him give his name.

57.     Plaintiff Miller then tried to discuss his complaint form with Defendant Captain Saucedo who was also lingering in the front hall.  Defendant Saucedo informed Plaintiff that the Lieutenant usually handles these matters.  Plaintiff Miller explained that he had tried to talk to Defendant Anderson, but Defendant Anderson had



been confrontational from the moment he walked in the door, and he kept interrupting him.

58.     Defendant Saucedo pulled Plaintiff to the side, away from the people waiting by the court room, to discuss Plaintiff's complaint form. Plaintiff Miller explained his concerns to Defendant Saucedo about the Section 30.06 and 30.07 signs.  Plaintiff Miller also told Defendant Saucedo that he wanted to use his video to show that Leon Valley acts differently than they were shown in Mexican Padilla's videos.  Defendant Saucedo and Plaintiff Miller shook hands twice during this conversation.  After taking pictures with his phone of his filled-out complaint form, Plaintiff Miller gave Defendant Saucedo the form




and offered to do a follow-up video hopefully showing Leon Valley in a positive light.  Plaintiff Miller then left the Leon Valley Municipal Building believing that this incident was over.

59.    Instead, a Defendant Officer informed Sergeant Joel Urdiales, a patrol sergeant, of Plaintiff Miller's visit to the Leon Valley Municipal Building.  Sergeant Urdiales, in turn, ordered Officer Jorge Breton to surveil Plaintiff from a parking lot across the street from the building because Plaintiff had "caused alarm by the lobby area of the Municipal Building."

60.    Before leaving the parking lot, Plaintiff Miller smoked a cigarette with his friend.  Approximately 20 minutes later, they got into Plaintiff Miller's vehicle and drove away, headed out of Leon Valley.  While Plaintiff Miller left the area in his vehicle, obeying all traffic laws, Officer Breton ran his license plate number through the police database.  This search, the approximate time of Plaintiff's departure from the Leon Valley Municipal Building occurred at about 4:42 P.M.

61.    With the complaint in hand, and running Miller's license plate, Defendant Salvaggio and Leon Valley police officers quickly learned that it was in fact Jack Miller that visited Leon Valley, a perceived member of one or more Auditor groups.

62.    Close to an hour after Plaintiff Miller left the Leon Valley Municipal Building, a Defendant Officer asked Defendant Vasquez, who had not observed any of the events that occurred, to speak with Defendant Rivera about what she had witnessed and to write a police report for a Place Weapons Prohibited charge. This police report was not entered into the system until about 5:45 P.M.—over an hour after Plaintiff's departure.  Defendant Officers could have arrested Plaintiff on the premises for the supposed crime he had committed, but they knew he did not commit one.

63.     This changed once they confirmed he was part of the group Defendant Salvaggio wanted to disrupt.  As a result, an officer that was not present during the interaction was the one to report the crime.

64.     Defendant Anderson later claimed in his police report that he made the decision to allow Plaintiff Miller to fill out a complaint form and leave, without stopping him or even initiating an arrest for supposedly bringing a gun onto the premises, because "his activist group and affiliates are known to cause major confrontations when arrest is imminent and drastically overreact and even resist arrest in order to capture the video and post it on social media platforms." "[I]t was determined that an arrest warrant would be obtained…instead of an on sight [sic] arrest and risking injuries or possible social media inspired disturbances."  Upon information and belief, Defendant Officers used Plaintiff Miller's alleged membership in one of these supposed "Auditor" groups to justify their treating him different from every other citizen present that day and to justify the long delay before they chose to charge him with a crime.

65.     Plaintiff Miller's every interaction with each police officer he encountered during his visit to the Leon Valley Municipal Building was tainted by their stubborn adherence to Michelle Barrientes Vela's pernicious theory about groups organized to harass police officers under the guise of exercising their First and Second Amendment rights.  It did not matter how politely Plaintiff Miller spoke with the police officers; they viewed him as a criminal—and treated him accordingly—the moment he stepped through the door.

**C. Former Police Chief Salvaggio's Next Move**

66.     Upon information and belief, following Plaintiff Miller's departure, Defendant Officers used the information he provided on his complaint form to identify him and reported the incident to their since-fired police chief, Defendant Salvaggio.  Defendant Salvaggio, who

remembered Plaintiff Miller from his Bexar County days and knew he was a political activist, realized this was the situation he had been waiting for.  Plaintiff Jack Miller filmed almost his entire visit to the Leon Valley Municipal Building; he had also visited while wearing what appeared to be a handgun.  Defendant Salvaggio concluded that Plaintiff Miller must be the link between the "First Amendment Auditors" and the "Second Amendment Auditors."  He knew his officers could not prove Plaintiff Miller had committed a crime, particularly the crime "Places Weapons Prohibited."  Plaintiff Miller had never entered the court areas.[5]  They did not have the supposed weapon he was wearing while in the municipal building in evidence, nor had any officer

---

[5] According to Opinion No. KP-0047 by Ken Paxton, the Texas Attorney General, decided December 21, 2015, Section 46.03(a)(3) of the Texas Penal Code only bans firearms in "a government courtroom or those offices essential to the operation of the government court."  The entire building that happens to house a courtroom does not qualify as the premises of the court; the court areas must be further limited to just the essential court offices and courtrooms.  License holders must be notified of their inability to carry on the premises of those specific courtrooms and offices essential to the operation of the court.

On May 31, 2018, the Leon Valley Municipal Building had not designated and warned license holders—like Plaintiff Miller—which areas belonged to the court.  Instead, they had illegally tried to ban license holders from bringing their handguns into the entire multi-use building using Section 30.06 and 30.07 signs—which as a political subdivision of the state, per Texas Government Code, Section 411.209(a), they are forbidden from using.



Plaintiff Miller who had not even passed the security officer checking people entering the building, merely stood in the area between this security officer and the door, an area which could not be construed as belonging to the court, had not carried his handgun onto the premises of the court. Nor had Plaintiff Miller been informed that the lobby of city hall, or even the area between the doors and the security officer, counted as part of the essential court area.  Per the laws of Texas, Plaintiff Miller would not have committed the crime "Places Weapons Prohibited" even if his rubber handgun had been real.

inspected the gun to determine if it was a real weapon.  Miller also represented to that it was a

rubber toy.  However, Defendant Salvaggio believed he could use their testimony that they

believed it was a real handgun and some highly simplified descriptions of the building in question

to manipulate the circumstances in his favor.

67.     Defendant Salvaggio instructed his officers to proceed with charging Plaintiff

Miller.  At about 5:45 P.M., close to an hour after Plaintiff Miller drove off, Defendant Vasquez

entered his police report into the system, and other Defendant Officers began adding their

supplemental reports concerning Plaintiff Miller's visits.

68.     This police report, which reported Plaintiff Miller's supposed crime, was not

completed by a police officer present during Miller's visit.  Instead, Defendant Vasquez was

ordered by Defendants Salvaggio, Anderson, or Saucedo to interview Defendant Rivera and write

the report.  Defendant Vasquez, consequently, could not rely on his own suspicions, beliefs, facts,

or even knowledge of the circumstances he witnessed to use in reporting this alleged crime.

Instead, he relied on others' portrayals of the events that occurred.  This, upon information and

belief, as intended, resulted in inaccuracies in the information included in his report, such as his

claim that Plaintiff Miller "moved further into the building uninvited, arguing with Officers and

detectives while having the weapon clearly visible and displayed a handgun clearly visible, in plain

view on his waist band, thereby violating Places Weapons Prohibited, 46.03."

69.     Rivera wrote in her report, and proceeded to tell Vasquez, that Miller entered

"Municipal Court" with a firearm.  This is blatantly false and known by Defendants to be false.

70.     In reality, Plaintiff Miller entered Leon Valley's City Hall and respectfully asked

Defendant Rivera—after she confirmed the building was not a court—to speak with someone

about the signage, moved a few steps to the side after speaking with Defendant Rivera to allow

other individuals to enter the building and to signal his location to Defendant Wells, and cordially explained his concerns to Defendant Wells.  Defendant Vasquez's inaccuracies magnified Plaintiff Miller's alleged crime.

71.     Salvaggio wanted to go after Miller and his family; he wanted to make it personal. He also wanted to collect whatever he could to prove his theory correct—that there are these organized auditor groups engaged in criminal activity.  His intent was to use this interaction to seek a warrant to conduct a midnight raid on Plaintiff's home.  He met with Defendants. Defendants put together a narrative that would allow them to seek a search and arrest warrant.

72.     To insulate Officer Rivera, since she knew that Plaintiff Miller did not have a real firearm, Vasquez agreed to write the report—even though he did not witness any crime.  Defendant King then agreed to prepare the affidavit based on Vasquez's report.  Defendants knew that the reports and affidavits concerning Miller's conduct was not correct, but they chose to lie anyway.

73.     Other officers, including Defendant Officers, added supplemental reports to Defendant Vasquez's police report.  Only Defendants Rivera, Wells, and Tacquard testified to seeing Plaintiff Miller carrying a supposed handgun; none of these Defendant Officers could offer proof beside visual assumptions that Plaintiff Miller was carrying a real firearm (even though Miller represented it was rubber, he was not detained, no one asked to inspect it, and when he was instructed to put it away, he did).  All of the officers who interacted with him made sure to include in their reports that they believed he was or received orders from someone who believed he was a "First Amendment Auditor" or a "Second Amendment Auditor."

74.     Additionally, Officers Vasquez, Rivera, and Saucedo all described the Leon Valley Municipal Building, Leon Valley's multi-use city hall, in their reports as the Leon Valley Municipal Court.  The building in question on that date also housed city hall, the police department,

24

the city manager, and animal control. While the building included more than just the municipal court, including their own police station, Defendant Officers tried to make it seem like the entire premises of the building belonged to the court.

75.     Defendant Detective King and Defendant Detective Munoz, who, unlike Defendant Detective Brooks, had not witnessed the events that had occurred, worked together on the application for the warrants.  As neither Detective had witnessed any of the events, Defendant King used Defendant Vasquez's police report and the supplemental reports written by Defendant Officers to complete an affidavit and submit it to the court with an Arrest Warrant and a Search Warrant.

76.     Defendant King and Munoz knew that Miller did not break any laws.  He did not enter into any courtroom or courthouse with a firearm, and the firearm he had was not real.  Not a single officer was able to identify the firearm as being real, or that it was "designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use."[6]  Yet, Defendants operated in agreement based on Chief Salvaggio's intent to exploit Miller's interaction with Leon Valley to arrest him and search his home.

77.     To meet Chief Salvaggio's intent, which they all agreed to do, Defendant King relied on the testimony of the reporting officers, rather than his own knowledge, to claim that the building Plaintiff Miller had entered was the Leon Valley Municipal Court and that Miller carried a handgun inside.  Knowing that only visual descriptions of a perceived weapon were a little weak, he bolstered his case by alleging that Plaintiff Miller "*is a member of a group which engages in open carry of weapons to draw attention to themselves from police officers and or the public.*

_____

[6] Tex. Penal Code 46.03.

*These individuals have proven in past encounters that they intentionally try to provoke a response from officers they might contact*."  He further supported his argument that Plaintiff Miller was a part of this alleged group by pointing out that Defendant Miller wore a Go Pro camera during the entirety of his visit and his car had cameras installed in both the front and the back.  Defendant King then testified under oath that after his initial conversation with Defendant Anderson, he "left the building and remained outside in the adjacent parking lot before leaving."  Plaintiff Miller's second—and much longer—trip inside—after he put the fake gun away—was completely omitted from any affidavit.

78.    In addition to the arrest warrant, Defendant King also used this affidavit to apply for a search warrant to seize as evidence, "a black semi-auto handgun, a Go Pro Camera, any cell phone media devices used to record, computer desktop or laptop, [and] photographic evidence."

79.    These warrants were signed off by a magistrate judge, who believed Defendant King's false accusations, at about 10:30 P.M.

80.    Defendants worked together to make false statements and material omissions knowingly and intentionally in King's affidavit for the warrant to arrest Miller and search his home.  Specifically, King represented that Miller entered the Leon Valley Municipal Court carrying a firearm—a statement all Defendants knew was not correct and materially misleading.

81.    While these warrants were pending, Defendant Salvaggio made his next move. Upon information and belief, Defendant Salvaggio believed that he could use these warrants to rid himself of his old pal Jack Miller and send a message to the "First Amendment Auditors" and "Second Amendment Auditors" at the same time.  Done properly, he thought he could persuade these hypothetical groups to never enter his police station again.  First, he would organize a middle-of-the-night raid on Plaintiff Miller's home.  This would show both auditor groups that he could

and would respond to their journalistic reports about his officers acting in their professional capacities by retaliating against their personal lives in the most inimical way possible. It would also show them that their public audiences were no match for the power he wielded with the courts as a law enforcement officer. Second, he would gather the evidence he needed to charge Plaintiff Miller with a third-degree felony. If the charges stuck, Plaintiff Miller would face 2-10 years in prison and up to a $10,000.00 fine. If Plaintiff Miller survived his jail time, he would be unable to possess any firearms in his residence for the next five years. This, of course, assumed that Plaintiff Miller a former jailer and sheriff's deputy would not face deadly violence while incarcerated.

82.     Salvaggio also hoped to collect as much information as possible to see if he and his team could find any possible evidence proving that the groups, First Amendment Auditors and Second Amendment Auditors, were real and amounted to organized criminal activity—which is what he unwaveringly believed.[7]

83.     Defendant Salvaggio, Police Chief of Leon Valley, personally organized a midnight, no-knock raid at Plaintiff Miller's home. Since Plaintiff Miller lives in Kirby, Texas— outside of Defendant Salvaggio's jurisdiction, he contacted the Kirby Police Department to request assistance with the service of their arrest warrant and search warrant. Defendant Salvaggio, the entire CID department (Anderson, E. Gonzales, Munoz, King, Brooks, Wells), his Captain (Saucedo), and two patrol officers (Tacquard, Griego) then traveled to the Kirby Police Department. At 10:00 P.M., before the warrants had been signed, Defendant Officer Wells headed

---

[7] Of course, no such groups existed, so in the end, this was futile for Salvaggio. Vela is now a convicted felon. Salvaggio was fired. Multiple lawsuits were filed. All criminal charges brought under the guise of these groups were dismissed. These things, together with multiple and egregious constitutional violations, was the result of Defendant Salvaggio's conduct at issue here.

to Plaintiff Miller's house to start surveilling, Kirby Police Officer Murphy also helped with surveillance. After the remaining officers were briefed on the situation, they traveled to Plaintiff Miller's home and established a perimeter.

**D. An Early-Morning, Guns-At-The-Ready Raid**

84.    At about 00:00, on June 1, 2018, Plaintiff Miller, and his cohabitant, Plaintiff Campbell, who had just finished her work shift, arrived home and entered their home.  At this time, Plaintiffs accidentally left the garage door open.  Plaintiff Mathew Pesina spent some time in the garage for a little bit, before returning inside.  Plaintiffs Miller, Campbell, Lisa Pesina, and Mathew Pesina settled in for a family movie night.  The Pesina children, J.G. and M.P., were asleep with their stuff animals on a mattress on the ground in the guest bedroom; the light was off, and the door was closed.

85.    At 00:30 on June 1, 2018, the waiting officers decided that with the garage still open, it would be good time to initiate the raid.  Upon information and belief, Leon Valley Defendant Officers wanted to use the battering ram they had brought with them to force Plaintiff Miller's door open—knowing they would be violently and suddenly entering in the middle of the night the home of a man who carried weapons to protect himself and his family—but the Kirby police officers assured them such an approach would be unnecessary.  Consequently, two Kirby police officers entered Plaintiff Miller's garage and knocked on the inside door to his home. Plaintiff Campbell, hearing the knocks, informed Miller that the knocks did not sound friendly. Worried about someone knocking on the door from the garage in the middle of the night, Plaintiffs Miller and Mathew Pesina approached the door with handguns in hand.  When Plaintiff Miller opened the door and saw the Kirby Police Officers, he and Plaintiff Mathew Pesina quickly set their handguns aside.

28

86.     The Kirby Police Officers standing in Plaintiff Miller's garage, told him they had received a call about people breaking into his car and wanted to know if everything was all right.

Believing their representations, a bare-chested Plaintiff Miller joined the officers on his driveway to check his parked car. While he stood next to the Kirby police officers, Defendant Officers, including Defendant Anderson carrying a battering



ram, approached his house from the side, entered his garage, and then entered his home, weapons at the ready, without even a knock.



87.     Defendant Officers had not procured a no-knock warrant; this combative and aggressive entrance had not been approved by the magistrate judge and lacked adequate justification.  Defendant Officers' unwarranted actions violated department policy and state laws and dramatically increased the danger Plaintiffs faced that night.

 

88.     Defendant Officers—most with AR-15s—stacked up against the garage door, with Defendant Anderson ready to knock it down with a battering ram—but after Defendant Brooks realized the door was unlocked, opened it and made entry before announcing their presence.



89.     Defendant Officers—after making entry—shouted "Police, Search Warrant!" and "Get down! Lay face down on the ground!" swept through Plaintiff Miller's home, automatic rifles raised, ready to fire.  These officers brandished and pointed their loaded rifles, shotguns, and pistols at Plaintiff Miller's partner, Plaintiff Campbell; son, Plaintiff Mathew Pesina; and daughter-in-law, Plaintiff Lisa Pesina as they entered.  Plaintiffs Campbell, L. Pesina, and M. Pesina were forced down onto the ground, while officers continued clearing the home.

90.     Defendants Salvaggio, Munoz, and Wells entered into Plaintiffs' home after the police stack made entry.

91.     Plaintiff Mathew Pesina, lying on the ground where he had been forced down by Defendant Officers, shouted at the officers that they had two babies, a two-year-old and a four-year-old.  He knew his children were sleeping in a dark room and was terrified an officer would accidentally step on one of his children while they swept through the home.

92.     Plaintiff Lisa Pesina had a clear view of an even more terrifying reality: she watched from the floor where she had been forced to lie, as Defendant King entered the room where her children slept with his AR-15 rifle raised, ready to fire.  Fortunately, Plaintiff Miller's grandchildren were asleep long enough that the officers saw and registered their presence before the children started moving.  Four-year-old Plaintiff J.G. woke up to an armed Defendant Griego sweeping his flashlight beam around the room; two-year-old Plaintiff M.P. woke up later.

  

93.     Plaintiffs M. Pesina, L. Pesina, and Campbell, who was in her nightgown, were handcuffed before Defendant Officers helped them back up off the floor.  Plaintiffs Campbell, M. Pesina, and L. Pesina were then detained in handcuffs in the living room.

94.     While Defendant Griego searched the room the children were sleeping in with a flashlight, Plaintiff J.G. woke up, tiredly crying, "I want to talk to Momma."  Defendant Griego, promised to call his mom over in a minute.  He then turned the room light on over the still-sleeping two-year-old and asked Defendant J.G. questions like his name, who he lived with, and whether he went to school.  Plaintiff L. Pesina was allowed to check on her children after she was handcuffed.  She reassured her son that the officers were just talking to Grandpa Jack and told him he needed to stay in his room.  A Defendant Officer offered to bring the children out to the living room full of armed officers, but Plaintiff L. Pesina requested her children not see her like that.  She never wanted her children to see her get in trouble.  Plaintiff L. Pesina was also afraid if the children saw what was really happening, they would be traumatized.  A handcuffed Plaintiff L. Pesina was then returned to the living room.

95.     Other Defendant Officers finished sweeping through the small home and cleared the house.  The officers then congregated in the living room surrounding the handcuffed Plaintiffs.

32

96.     Outside, Kirby police officers informed Plaintiff Miller he was under arrest and placed him in handcuffs.  While they were handcuffing him, Defendant Salvaggio approached Plaintiff Miller.  A confused Plaintiff Miller asked, "Are you Salvaggio?"  A delighted Defendant Salvaggio responded, "Absolutely," and then, when Plaintiff Miller swore, told him, "Welcome." Defendant Salvaggio then told Plaintiff Miller, "I remember you in your Bexar County days, actually Jack."

97.     Plaintiff Miller asked why he was being arrested.  Defendant Salvaggio told him he was "being arrested for uh, for uh, for bringing a prohibited weapon into a secure area today." When Plaintiff Miller, who knew that the so-called prohibited weapon was a rubber prop gun, told Defendant Salvaggio that the Leon Valley officers were a joke, Defendant Salvaggio responded, "No. And you're going to provide us all the evidence.  That's the great part."

98.     An upset Plaintiff Miller told Defendant Salvaggio that the Defendant Officers were idiots.  Defendant Salvaggio agreed, "Yes, yes.  We're idiots.  But we're not sitting here in cuffs, Jack.  That's the beauty of it.  That's the beauty of it."  Defendant Salvaggio also told Plaintiff Miller, "So, Jack, you were beautiful today," and "I appreciate you coming. To visit us.  This is awesome."

99.     When the officers moved to take Plaintiff Miller into his house to read him the search and arrest warrant, Defendant Salvaggio gloated, "That's the beauty of it, Jack.  You're not in charge.  That's the awesomeness."  Defendant Officers then moved Plaintiff Miller to his kitchen, before eventually sitting him at a chair at the kitchen table, where Plaintiff Miller could see his handcuffed family.



100.    Shortly after Plaintiff Miller was brought handcuffed into his kitchen, he began making loud statements in front of his family and the Kirby police officers, like informing the Defendant Officers that he had been wearing a rubber Glock—a prop weapon—at the Leon Valley Municipal Building during his visit the day before, warning his family not to speak to the police, and requesting his family call his criminal attorney  once they were released.  Following these statements, Defendant Officers determined it was necessary to immediately move Plaintiff Miller back to his garage.

101.    Back outside, the officers summarized the warrants for Plaintiff Miller rather than reading them to him word-for-word.  Defendant King told Plaintiff Miller that they had an arrest warrant because he came into the *police department* with a handgun.  Plaintiff Miller asked the Defendant Officers if they were aware that he had a license to carry.  They confirmed knowledge of his license.  Defendant King then told Plaintiff Miller that the search warrant was for the handgun he had used the day before and the electrical devices he had used to record; these items were to be collected as evidence.  They did not inform him that they had obtained a search warrant for any computer or laptop.

102.    Defendant Griego then read Plaintiff Miller his Miranda rights and transported him downtown.  Before turning Plaintiff Miller over to the Bexar County Sheriff's Office's custody, Officer Griego verbally criminally trespassed Plaintiff Miller, like Mexican Padilla, another so-called "Auditor," had been, from all Leon Valley Municipal facilities, including the City Hall and Police Department at 6400 El Verde, the Fire Department at 6300 El Verde, the Library at 6425 Evers Road, the Community and Conference Center at 6427 Evers Road, the Public Works at 6429

Evers Road.  Defendant Griego also criminally trespassed Plaintiff Miller from any City Parks at 6440 Evers Road.  If Plaintiff Miller entered one of those properties in the future, he would be subject to arrest.

103.    Meanwhile, Plaintiffs Campbell, L. Pesina, and M. Pesina were kept handcuffed in the living room.  Defendant Officers insisted that Plaintiffs identify themselves.  When Plaintiff M. Pesina, who knew that as a detainee he did not have to identify himself, refused, they threatened to arrest him.  Under threat of arrest, he identified himself.  Defendant Officers then ran Driver's License and NCIC ID Index searches on all of the adult Plaintiffs.  Even when these searches came back clear, they left Plaintiffs detained in handcuffs.

**E. The Ransacking of Plaintiffs' Home**

104.    Leon Valley Defendant Officers insisted that the Kirby police officers move outside when they began searching the house.  The one exception was Kirby Police Officer Donald Lackey whom Plaintiff L. Pesina requested look after Plaintiffs J.G. and M.P.  He was the only officer not wearing a smug smirk, and, therefore, the only officer she would trust with her children.  Officer Lackey took up a guard position at the door to the children's room and watched over them that night.  He even helped calm these little ones' fears about the armed police officers roaming their home by gifting them each a police badge sticker.

105.    The Kirby Police Officers all appeared to have body cameras during their participation in the raid.  Of the Leon Valley Police Officers, Detectives, Supervisors, Captain, and Police Chief present that night, Defendant Patrol Officer Griego was the only Leon Valley

Officer wearing a body camera.  When Defendant Griego left to take Plaintiff Miller downtown, the only Leon Valley body camera left with him.



106.    Before that night, Plaintiff Miller had, as a joke and a security measure, positioned fake cameras outside his home.  Defendant Officers, believing these were real cameras, modified the camera positions downward so they could not record Defendants' conduct.[8]  Defendant Officers then went in search of the DVR they believe corresponded with these (fake) cameras. After a thorough search, one Defendant Officer brought a device he believed to be the DVR into the living room.  Other Defendant Officers had to break the news to him, in front of Plaintiffs, that the device he was holding was, in fact, a Blu-ray player.  Defendant Officers then concluded that, if they could not locate a DVR, the fake cameras must be Wi-Fi operated.  Consequently, they seized Plaintiffs' Wi-Fi modem and took it as evidence.  This is listed on the list of seized items

---

[8] When Mr. Miller returned home the next day after being released on bond, he had to push all these cameras back into position.

as "Ubee Monitor Model: UBC1301." This modem could not in any way be construed as evidence related to Plaintiff Miller's visit to the Leon Valley Municipal Building; Defendant Officers had not requested nor received permission from the magistrate judge to seize Wi-Fi routers from Plaintiffs' residence. This Wi-Fi modem was seized illegally.

107.    Assured that they were no longer being recorded by any means, Defendant Officers then proceeded to ransack Plaintiffs' home. They tore through drawers and rummaged through cabinets. They dug through Plaintiffs' closets and inspected their attic. When they found the gun safe in the hall closet, they broke the safe open to forcefully gain access to its contents. The disappointed Defendant Officers—to Plaintiffs' amusement—only discovered their liquor storage.



108.    Despite the limited number of items Defendant Officers had requested from and been granted permission to seize by the magistrate judge, Defendant Officers took whatever they wanted. They seized Plaintiff Miller's Norinco rifle, which is not, nor ever could be considered, "a black semi-auto hand gun," the only type of gun they had received permission to seize. They also seized a (silver and black) Glock 19, a (silver and black) Smith & Wesson SD9 VE, and a plastic black Stinger P9T. They completely missed the painted-black rubber Glock that Plaintiff



Miller had left in the glove compartment of his Lexus that night, the prop gun he had worn into the Leon Valley Municipal building the day before, even though they searched that vehicle in front of Plaintiff Campbell.

9



109.     Defendant Officers also seized a 15-round magazine, 15-9 MM Luger live rounds, 2 spent rounds, a magazine, 16-9 MM Luger live rounds, a rifle magazine, and 28 live rifle rounds, along with a black belt with tan holster, a black gun holder, and a black case.  None of these firearm accessories were listed on the judge-signed Search Warrant.  Defendant Officers also tried to take two other firearms, but Plaintiff Campbell insisted that those firearms belonged to her.  Ultimately, the Defendant Officers left those weapons.

110.     Defendant Officers, who had received permission to seize "a Go Pro camera, any cell phone media devices used to record, computer desktop or laptop, [and] photographic evidence" and who had informed Plaintiff Miller they were only taking the electrical devices he had used the day before to record, then seized a number of electronic devices.  These included devices that could conceivably have evidence of Plaintiff Miller's supposed crime: a black iPhone, a white and red iPhone, a Hero Session GoPro, a Hero Session GoPro5, a microSDHC (memory

---

9 The blue rubber pistol had been painted black during the incidents in question.  Plaintiff Miller later removed this black paint.  The black plastic handgun is the Stinger P9T that was seized during the raid.

  

card), a SanDisk Ultra 4GB (memory card), and a microSD SanDisk (memory card). These also included devices that could not contain the evidence they supposedly needed: a Powershot SD1200 1S Digital (a digital compact camera), a Nikon CoolPix (a digital compact camera), a Cobra dashcam device, a Logitech HD 1080p Camera (a webcam), a Sunpack FlexPodDX camera holder (a tabletop tripod), a Canon Vixia HF R600 video recorder (a camcorder), two miscellaneous cables, a blue Aurinia thumb drive (USB flash drive), and an iBuyPower i-Series tower (gaming desktop PC). They also seized a white and red iPhone belonging to Plaintiff Campbell. Even though Plaintiff Campbell proved that the phone belonged to her by providing the passcode,



Defendant Officers still seized it as evidence. Plaintiff Campbell was permitted to write down several phone numbers she needed from the phone, before they made her add it to the list of items seized. Defendant Officers also attempted to seize Plaintiffs L. and M. Pesina's phones but allowed them to keep them when they proved ownership by entering their passwords. Defendant Officers also left Plaintiff Campbell's laptop since the login screen specifically stated it was her computer.

111.     Defendant     Officers additionally planned to take a TV from Plaintiff Miller's study but abandoned it by the front door when they left.  While forcefully seizing this TV, Defendant Officers snapped off the HDMI cord attached to the back of the TV.





112.     During their search, Defendant Officers also dismantled an expensive handmade lamp in Plaintiff Miller's study. They tore the lightbulb holder from the base, permanently destroying the lamp.

113.     When they departed, Defendant Officers left the  study a torn-apart mess.[10]




114.     Last, Defendant Officers, in blatant disregard for the limits of their Search Warrant, seized unspecified or undescribed "Jack Miller documents."

---

[10] First picture of the study taken by Defendant Officers during the raid.  Second picture taken by Plaintiff Miller the next day.

115.    At last satisfied that they had taken everything they wanted, Defendant Officers began leaving the premises.  Defendant Salvaggio instructed the remaining Defendant Officers that it was time to head out.  During this command, Plaintiff M. Pesina observed a loaded handgun, completely missed by Defendant Officers during their search, resting on the shelf above Defendant Salvaggio.

116.    Plaintiffs M. Pesina and Campbell were kept handcuffed until right before the officers left.  Plaintiff L. Pesina was released from handcuffs earlier so that she could help her young children use the restroom during the Officers' search; Defendant Officers did not replace the handcuffs after they removed them.

**F. Emotional Aftermath**

117.    Following this egregious desecration of their rights, following the militaristic stomping of boots, the strident shouting of orders, and the rummaging of nine different officers tearing apart their small home for over an hour, Plaintiffs were left in a quiet mess, shaken by everything they had endured.

118.    Plaintiffs M. and L. Pesina, along with their children J.G. and M.P. stayed the rest of the night at Plaintiffs Miller's and Campbell's home.  Plaintiff L. Pesina remembers staying awake the entire night.  An officer had informed her during the raid that the Defendant Officers had been watching them all day.  She could not get the idea out of her head that they might still be watching them, waiting to storm back in at a later hour.

119.    Although they had been living with Plaintiffs Miller and Campbell prior to the raid, the next morning Plaintiffs M. and L. Pesina packed themselves and their children up and temporarily moved in with a friend.  Since the raid, Plaintiffs M. and L. Pesina have been too

scared to visit Plaintiff's M. Pesina's father's home more than once.  They fear officers showing up again and detaining them and their children at gunpoint just for being there.

120.    Plaintiff M. Pesina, now knowing that police officers can get by with completely disregarding the law and people's constitutional rights whenever they feel like it, fears every encounter with police officers.  Even traffic stops terrify him.  He feels that an officer could get mad over anything and violate his rights with impunity again.

121.    Plaintiffs Miller and Campbell fear being subject again to the whims of corrupt police officers and their capricious decisions to record or not to record video evidence.  Having faced the desecration of their home at the hands of police officers not wearing body cameras that night, Plaintiffs have now incorporated cameras into every area of their lives for their own protection.  Plaintiffs are fearful to go anywhere without a camera—out of fear that they are being watched and targeted and would need to establish that they did nothing wrong.

122.    Plaintiffs J.G. and M.P. were confused and scared by the events of that night.  To avoid emotionally scarring their children and potentially causing nightmares or fear of all police officers, Plaintiffs M. and L. Pesina glossed over the events of that night.  They told their children that the officers were friends of Papa Jack's, that the officers were there that night only to talk to him, and that Papa Jack left to go have fun with them.  Even then, these small children still have doubts concerning what actually happened that night, including why the officers carried such large weapons.

123.    Due to Defendants' conduct, all Plaintiffs have fears of being followed and subject to future invasions of their homes.  They have difficulty sleeping and experience anxiety and PTSD.

**G. Lingering Malice**

124.    Defendant Officers, not content with the terror they had caused forcefully entering Plaintiffs' home with weapons drawn, with their attempt to muzzle Plaintiff Miller by pillaging as many of his firearms and recording devices as they could find, and with the discomfort Plaintiff Miller endured spending a night in jail, moved to prosecute Plaintiff Miller on the bogus charge "Places Weapons Prohibited."

125.    Defendant Officers knew that Plaintiff Miller had not entered an area of the court with a firearm.  They also knew that they had failed to secure a single all-black, semi-automatic handgun from his residence to prove that Plaintiff Miller even owns an all-black semi-auto handgun.[11]  They moved forward with pressing charges anyway, submitting a Charge and Disposition Report at 1:00 A.M., on June 1, 2018, for the charge "Places Weapons Prohibited." This charge was dismissed by the Bexar County District Attorney's Office on January 14, 2020, for insufficient evidence.

126.    While Plaintiff Miller had to defend against this charge in court, Defendant Officers obtained a search warrant to search the information on his seized devices on June 4, 2018, and, on June 5, 2018, requested the San Antonio Police Department Computer Forensic Laboratory retrieve "any and all visual or audio recordings, including *text messages and contacts* that are stored on [each] device." Defendant Officers then submitted a corrected warrant on June 12, 2018, and on June 13, 2018, released all of the devices to Homeland Security.  The United States Secret Service returned these devices on May 20, 2019.  Even after seizing every electronic device of

---

[11] Plaintiff Miller, in fact, does not nor did he at the time own an all-black semi-auto handgun.  He intentionally purchases firearms that look different from the prop weapons he uses during his political activism to prevent officers from later trying to claim he was carrying a real firearm when he was not.

Plaintiff Miller's the Defendant Officers could find in his home and having a federal agency investigate them for almost a year, Defendant Officers could not find any evidence they hoped to find.

127.    Following the raid and other events, individuals began protesting at the Leon Valley Police Department in June of 2018.  On June 5, 2019, Defendant Officers tried to file "Organized Crime" charges on Plaintiff Miller and four individuals who had been present filming at a peaceful protest at the Leon Valley City Hall, on Saturday, June 23, 2018.  (Plaintiff Miller had made a brief appearance that day at the protest.)  Defendant Salvaggio believed these four other individuals were members with Plaintiff Miller of the "First Amendment Auditors" and this supposed group had conspired together to commit crimes against his person, his family, and the Leon Valley Police Department.  These charges were rejected by the Bexar County District Attorney's Office.

128.    Following the January 14, 2020, dismissal of the "Places Weapons Prohibited" charge for Plaintiff Miller—and recognizing potential statute of limitations concerns to seek criminal charges from Miller's May 31, 2018 visit to Leon Valley's municipal building—Defendant Salvaggio reached out to the Leon Valley Municipal Court Judge Lawrence G. Morales and asked him to write a letter about court security.  Judge Morales wrote a letter on March 13, 2020, expressing concern for courthouse shootings and stating that he does not allow "anyone, outside of law enforcement, to carry or bring firearms into the courtroom, and the area where court business is conducted."  In this March 2020 letter written almost two years after Plaintiff Miller's visit to complain about the Section 30.06 and 30.07 signs, Judge Morales defined the court area as the "courtroom," "the court staff area and public area (lobby) outside the clerk's office . . . up to the front door of the main entrance to the municipal court offices."  He also mentioned a June 2017 meeting to discuss security.

129.    Faviola Garcia, the Senior Court Clerk, also wrote a letter expressing concern for the risk of potential shootings.  In her letter, she claimed that the "court staff area, the public area outside in the lobby, and the waiting area in the lobby as soon as you come into the building" have been the Municipal Court office since June of 2017, since "court functions are conducted on a daily basis by the court staff in each of those areas."  These claims are overstated; Leon Valley only holds their Municipal Court on Thursdays, not every day.



130.    Lastly, Defendant Salvaggio penned a letter on March 13, 2020, on the topic of court security and Plaintiff Miller's June 1, 2018, arrest.  In this letter, he claimed the essential court area had been determined to be from the second door of the foyer since June of 2017.  He also claimed when Plaintiff Miller entered this area on May 31, 2018, the "Municipal Court was in session with hundreds of people in attendance."  That would be an impressive number of people crammed into the courtroom since the lobby was mostly empty that day and their courtroom is only a little bigger than the front lobby area.

131.    Following the writing of these three letters on Friday, March 13, 2020, Defendant Officers tried to re-submit charges against Plaintiff Miller on Tuesday, March 17, 2020, over 21 months after the incident in question.  The Bexar County District Attorney's Office rejected this charge outright.

132.    A year later, a new City Manager took over running the City of Leon Valley and Defendant Salvaggio was fired by the Leon Valley Police Department.  Upon information and belief, when the new City Manager discovered that Defendant Officers were still holding onto Plaintiff Miller's and Campbell's seized property, she directed Defendant Officers to return this property to Plaintiffs.  In 2021—years after Defendant Officers seized Plaintiffs' possessions as evidence of a crime that had never occurred, Plaintiffs finally received their belongings back.

## H. Why?

133.    When Defendant Salvaggio met Mexican Padilla down a side hallway of city hall, even though he ended up forcefully arresting him, he treated him like a regular citizen.  When Plaintiff Miller met Defendant Officers at the same building a month later, they were brusque and argumentative.  Multiple officers were stationed around him to keep an eye on him—most of them added after Plaintiff Miller had placed his rubber gun in his car and been checked for other weapons.  The receptionist abandoned her desk, and a detective brought out a body camera to record his interactions.  An officer was stationed across the street to watch him leave and to run his license plates.

134.    Defendant Officers raided Plaintiff Miller's home in the early hours of the next morning and used the charge "Places Weapons Prohibited" to take every firearm, recording device, and computer of his they could find.  His family were held at gunpoint and then detained in handcuffs for over an hour while Defendant Officers rummaged through their undergarments and their coffee mugs, their medicine bottles and their shoes.  Plaintiff Campbell was in her nightgown when over ten male officers forcefully entered her home.  Plaintiffs L. Pesina and M. Pesina had to sit in the living room and listen to their children in the back bedroom ask what was going on,

knowing the truth would only hurt them.  Plaintiff Miller spent the night in jail and almost two years fighting a felony charge.

135.    Why?  Because Michelle Barrientes Vela told Defendant Salvaggio that people who exercise their First and Second Amendment rights are organized groups of criminals determined to annoy, disrupt, and frustrate police officers, and he wholeheartedly believed her.

## COUNT I
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
## (First Amendment – Retaliatory Arrest)

136.    Plaintiffs incorporate herein all the prior allegations.

137.    Plaintiffs assert this claim against Defendants Salvaggio, King, Rivera, Saucedo, Anderson, Brooks, Wells, E. Gonzales, Vasquez, and Tacquard.

138.    Defendants intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently detained, handcuffed, and/or arrested Plaintiffs without any lawful basis.

139.    These adverse acts were done due to Plaintiff Miller's exercise of his First Amendment right to free speech and his right to file a formal complaint against law enforcement at city hall.

140.    The arrest of Plaintiff Miller—and his family—were retaliatory and based on Defendants Salvaggio, Rivera, Wells, Anderson, E. Gonzales, Brooks, Saucedo, Tacquard, Munoz, Vasquez, and King knowing, deliberate, and reckless disregard for the truth, wherein they made false statements and omissions that created falsehoods that were incorporated into documents, including police reports, an affidavit, and a no-knock search warrant. Such statements were material and necessary to finding probable cause for the false charges that were levied against Plaintiff Miller. The retaliatory arrest was made and continued under the color of law and without proper investigation, study, diligence, or basis. Further, these Defendant Officers had no

knowledge of any fact or circumstance which would lead a reasonable person to believe that Plaintiff Miller committed any offense, whatsoever.

141.    Defendant Rivera observed Plaintiff Miller and had him step to the side so she could get Defendant Wells to speak with him about his desire to submit a formal complaint.  Wells tells Miller he needs to leave with the firearm, which Plaintiff Miller does.  When outside, Miller turns around and talks with Defendant Anderson.  Defendant Tacquard observed these interactions. After Plaintiff Miller puts away his fake gun, he returns to the building to make a written complaint.  There, he interacts again with Defendants Rivera and Anderson.  He also spoke with Defendants Brooks and Saucedo.  Defendant E. Gonzales observed these interactions.  Overall, Miller's interactions appeared positive and ended without any detainment or arrest.

142.    Once Miller left, and Defendants identified Miller as a First or Second Amendment activist, these defendants communicated with Defendant Salvaggio, and the defendants conspired to go after Miller and his family for attempting to report the complaint over Leon Valley's signage. Every Defendant that interacted with Miller made false reports and statements to Munoz and King for the purpose of obtaining unlawful arrest and search warrants.

143.    To facilitate and protect this unlawful process, Defendants Salvaggio, Saucedo, and Anderson, in conspiracy with each other and one or more Defendants, resulted in Defendant Vasquez writing the report that Miller violated the law—even though Vasquez did not witness Miller's interactions or visit with Leon Valley—and this report would then be relied upon by Defendant King to prepare his false affidavit.

144.    King made the affidavit to support the search and arrest warrants knowing that his statements were false.  King reported that Miller was inside the court facility.  He works at Leon Valley and knows that the building was multi-use, and contained a police department, utility

48

offices, City Hall, etc.  He also knew that Miller never went inside any court room—or even the multi-use building while armed with the fake gun.  He also knew that none of the officers that interacted with Miller detained him, asked about his weapon, or confirmed that it was a weapon that would otherwise be prohibited from the area.  King made omissions and false asserts to specifically misrepresent to the magistrate that Miller committed a crime.

145.    All Defendants knew that Miller did not commit any crime but worked together to manufacture false statements for the purpose of obtaining search and arrest warrants to go after Miller and his family.

146.    All Defendant Officers intentionally arrested Plaintiff Miller and/or had him arrested with the intention of deterring him from exercising his First Amendment right to file a complaint at city hall.

147.    Defendant Officers conduct in entering Plaintiffs' home and aiming firearms at all of them deprived them of their liberty without their consent, probable cause, legal justification, just cause, or any other legally valid reason.

148.    Plaintiffs suffered emotional injuries and pain, mental anguish, humiliation, and embarrassment, in addition to other harms, as a result of Defendants' collective conduct.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**(First Amendment – Retaliatory Arrest)**

149.    Plaintiffs incorporate herein all prior allegations.

150.    Plaintiffs assert this claim against Defendants Salvaggio, King, Rivera, Saucedo, Anderson, Brooks, Wells, E. Gonzales, Vasquez, and Tacquard.

151.    Defendants intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently detained, handcuffed, and/or arrested Plaintiffs without any lawful basis.

152.    These adverse acts were done in retaliation to Plaintiff Miller being a person that routinely records or photographs police officer performing official duties in the public square.

153.    The arrest of Plaintiff Miller—and his family (remaining Plaintiffs)—were retaliatory and based on Defendants Salvaggio, Rivera, Wells, Anderson, E. Gonzales, Brooks, Saucedo, Tacquard, Munoz, Vasquez, and King knowing, deliberate, and reckless disregard for the truth, wherein they made false statements and omissions that created falsehoods that were incorporated into documents, including police reports, an affidavit, and a no-knock search warrant. Such statements were material and necessary to finding probable cause for the false charges that were levied against Plaintiff Miller. The retaliatory arrest was made and continued under the color of law and without proper investigation, study, diligence, or basis. Further, these Defendant Officers had no knowledge of any fact or circumstance which would lead a reasonable person to believe that Plaintiff Miller committed any offense, whatsoever.

154.    Once Miller left, and Defendants identified Miller as a First or Second Amendment activist, these defendants communicated with Defendant Salvaggio, and the defendants conspired to go after Miller and his family for attempting to report the complaint over Leon Valley's signage. Every Defendant that interacted with Miller made false reports and statements to Munoz and King for the purpose of obtaining unlawful arrest and search warrants.

155.    To facilitate and protect this unlawful process, Defendants Salvaggio, Saucedo, and Anderson, in conspiracy with each other and one or more Defendants, resulted in Defendant Vasquez writing the report that Miller violated the law—even though Vasquez did not witness Miller's interactions or visit with Leon Valley—and this report would then be relied upon by Defendant King to prepare his false affidavit.

156.    King made the affidavit to support the search and arrest warrants knowing that his statements were false.  King reported that Miller was inside the court facility.  He works at Leon Valley and knows that the building was multi-use, and contained a police department, utility offices, City Hall, etc.  He also knew that Miller never went inside any court room—or even the multi-use building while armed with the fake gun.  He also knew that none of the officers that interacted with Miller detained him, asked about his weapon, or confirmed that it was a weapon that would otherwise be prohibited from the area.  King made omissions and false asserts to specifically misrepresent to the magistrate that Miller committed a crime.

157.    All Defendants knew that Miller did not commit any crime but worked together to manufacture false statements for the

158.    Defendant Officers intentionally arrested Plaintiff Miller and/or had him arrested with the intention of deterring Plaintiff Miller from engaging in First Amendment auditor activities.

159.    Defendant Officers' conduct in entering Plaintiffs' home and aiming firearms at all of them deprived them of their liberty without their consent, probable cause, legal justification, just cause, or any other legally valid reason.

160.    Plaintiffs suffered emotional injuries and pain, mental anguish, humiliation, and embarrassment, in addition to other harms, as a result of Defendants' collective conduct.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Unlawful Entry)

161.    Plaintiffs incorporate herein all prior allegations.

162.    Plaintiffs assert this claim against Defendants Salvaggio, Saucedo, Anderson, E. Gonzales, King, Munoz, Tacquard, Wells, and Griego.

163.    Defendant Officers, acting under color of law, violated all Plaintiffs' constitutionally protected rights including their right to be free from unlawful entry without probable cause, guaranteed by the Fourth Amendment.

164.    These Defendants—after obtaining the search warrant through false information—conspired together to execute the warrant as a no-knock warrant.

165.    Knowing that Plaintiff Miller was not inside the house and was already detained, and without informing him of the search warrant—these Defendant Officers, led by Defendant Anderson approached Miller's home with a battering ram.

166.    Defendant Brooks reached for the door handle and opened the door.  The ram was not used.  Once the door opened, Brooks made entry with Gonzales, Tacquard, King, Saucedo, Griego, and Anderson behind him.  The officers did not announce their presence or purpose until after they made entry into Plaintiffs' home.

167.    After they made their way into the home, Defendants Salvaggio, Munoz, and Wells also entered.

168.    These Defendants used the illegally obtained warrant as a basis for entering the Plaintiffs' home.  Defendants Salvaggio, Saucedo, Anderson, E. Gonzales, King, Munoz, Tacquard, Wells, and Griego entered the Plaintiffs' home unlawfully.

169.    Plaintiffs suffered emotional injuries and pain, mental anguish, humiliation, and embarrassment, in addition to other harms, as a result of Defendants' collective conduct.

**COUNT IV**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**(Fourth Amendment – Unlawful Search)**

170.    Plaintiffs incorporate herein all prior allegations.

171.     Plaintiffs assert this claim against Defendants Salvaggio, Saucedo, Anderson, E. Gonzales, King, Munoz, Tacquard, Wells, and Griego.

172.     Defendant Officers, acting under color of law, violated all Plaintiffs' constitutionally protected rights including their right to be free from unlawful search without probable cause, guaranteed by the Fourth Amendment.

173.     These Defendants—after obtaining the search warrant through false information— conspired together to execute the warrant as a no-knock warrant.

174.     Defendants searched the home and seized firearms, phones, and other electronics that were not identified in the scope of the illegally-obtained search warrant.

175.     Plaintiffs suffered emotional injuries and pain, mental anguish, humiliation, and embarrassment, in addition to other harms, as a result of Defendants' collective conduct.

## COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Excessive Force)

176.     Plaintiffs incorporate herein all prior allegations.

177.      Defendants Brooks, Gonzales, Tacquard, King, Saucedo, Griego, and Anderson, acting under color of law, violated all Plaintiffs' constitutionally protected rights including their right to be free from excessive force.

178.     Defendant Officer King filed a false affidavit to obtain a no-knock warrant based upon false information provided by Defendant Officers Vasquez, Rivera, Anderson and Wells.

179.     Defendant Salvaggio conspired with Defendant Officers to use the illegally obtained warrant as a basis for entering the Plaintiffs' home at the dark of night with weapons drawn.

180.    Upon entry of the home, Defendants Brooks, Gonzales, Tacquard, King, Saucedo, Griego, and Anderson, aimed loaded firearms at everyone inside, including the two minor children, Plaintiffs M.P. and J.G.

181.    Defendant King—despite being told that minor children were in a bedroom—went into that bedroom with his AR-15 raised and finger on the trigger.

182.    These other defendants held the remaining Plaintiffs at gunpoint. Brooks and Saucedo had AR-15s; Tacquard a shotgun; and Gonzales, Griego, and Anderson with pistols.

183.    Plaintiffs where psychologically harmed by the presence of plain-clothed officers and other officers with SWAT-like gear and firearms barging into the residence in the middle of the night.

184.    Plaintiffs were held at gunpoint, before and after being handcuffed, without regard to age, status, or reason.

185.    Defendants' unlawful conduct deprived Plaintiffs of feeling safe and secure in their home.

186.    Defendant Officers are trained police officers with hundreds of hours of firearm training among them. They understand the difference between conducting a warrant during the day with a knock, and a no-knock warrant in the middle of the night. Defendant Officers understood that their conduct was likely to cause psychological harm to Plaintiffs.

187.    Defendants succeeded. Plaintiffs were psychologically harmed. Without time to process what had occurred, Plaintiffs thought they were about to endure imminent substantial harm or death.

188.     After having time to process what occurred, re-living the raid over and over, day to day, Plaintiffs realize that they could have been subject to imminent substantial harm or death—especially had Defendant Officers construed any movement or action by Plaintiffs as a threat.

189.     Defendants knew that Plaintiffs were not committing any crime but intended to cause psychological damage.  Defendants also caused property damage.

190.     Defendants' actions were excessive and without any lawful basis.

191.     Plaintiffs suffered emotional injuries and pain, mental anguish, humiliation, and embarrassment, in addition to other harms, as a result of Defendants' collective conduct.

### COUNT VI
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Malicious Prosecution)

192.     Plaintiffs incorporate herein all prior allegations.

193.     Plaintiff Miller brings this claim against Defendants Salvaggio, Saucedo, Anderson, E. Gonzales, Munoz, and King.

194.     These Defendants conspired together to facilitate the prosecution of Plaintiff Miller despite knowing that he was innocent and had not committed any crimes.  Specifically, these Defendants filed false reports to the prosecutors' office claiming that Miller had an actual firearm inside of a court.

195.     Defendants made false statements and reports in order to commence and initiate criminal proceedings against Plaintiff Miller.  The criminal proceedings terminated in Plaintiff Miller's favor as the charges brought against him were dismissed since he did not have a real firearm and was not inside a court room.  Accordingly, Plaintiff Miller was innocent of the crime charged.  Defendants lacked probable cause to initiate the criminal proceedings, since they knew that Miller did not have a real gun and was not in a courtroom.

196.    Defendant Officers lacked probable cause to initiate the criminal proceeding because they knew Miller did not have a real gun.

197.    Defendant Officers acted with malice by filing a false affidavit and obtaining a no-knock warrant, and then proceeded to execute the warrants, search, arrest, and then the charges—despite knowing that Miller did nothing wrong and their conduct was based on false information and done in furtherance of Defendants' conspiracy.

198.    Plaintiff Miller suffered emotional injuries and pain, mental anguish, humiliation, and embarrassment, in addition to other harms, as a result of Defendants' collected conduct.

**COUNT VII**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**(First Amendment – Retaliatory Prosecution)**

199.    Plaintiffs incorporate herein all prior allegations.

200.    Plaintiff asserts this claim against Defendants Salvaggio, Saucedo, Anderson, Munoz, and King.

201.    Defendant Salvaggio, conspiring with Defendants Saucedo, Anderson, Munoz and King, all acting under color of law, maliciously induced the process to charge Plaintiff Miller with a frivolous criminal charge.

202.    Defendant Salvaggio personally knows Plaintiff Jack Miller.  Defendant Salvaggio regularly communicated with other law enforcement officials and prosecutors about Jack Miller and his activist activities.

203.    Once Jack Miller filed a complaint against the Leon Valley Police Department to address their unlawful signage—the agency Salvaggio was the then-chief of police for—Defendant Salvaggio made it his goal to go after Plaintiff Jack Miller and his family to chill his First

Amendment activities.  It did not matter that Plaintiff Miller had a constitutional right to file the complaint against the Leon Valley Police Department.

204.    Defendant Salvaggio suspected that Plaintiff Miller was a constitutional activist affiliated with these alleged-organized groups that felon-Vela told him sol much about, and he wanted to send a message to Miller—and others—that First and Second Amendment activists were not welcome in Leon Valley.  His message was that if you came to Leon Valley, your home would get raided, you and your family would be arrested, and then you would be prosecuted.

205.    Defendant Salvaggio knew that Miller was not inside of a Leon Valley courtroom with a firearm.  It did not matter.  He used this interaction, in conspiracy with other Defendants, to further their plan to chill Miller's First Amendment rights to file a complaint and to protest against bad actors within government.

206.    Plaintiff Miller arriving at Leon Valley's multi-use building with a fake firearm gave Defendant Salvaggio what he needed.  Defendant Salvaggio then coordinated with Defendants to facilitate obtaining a no-knock warrant and then executing the midnight raid with over a dozen officers and loaded firearms.

207.    Following the execution of the warrant, Defendant Salvaggio and his cohorts held one or more meetings with prosecutors to learn what information prosecutors needed to initiate prosecution.

208.    Defendant Salvaggio, in a coordinated effort with one or more Defendant Officers, prepared information to produce a false narrative that Defendant Salvaggio knew was sufficient for prosecutors to initiate criminal prosecution against Plaintiff Miller.

209.     Defendant Salvaggio, in coordination with Defendant Officers, made numerous false statements about Plaintiff Miller being inside a courthouse with a firearm when Defendant Officers knew that Miller was not inside of a courthouse, and that he did not have a real firearm.

210.     This adverse act was done in retaliation for Plaintiff Miller engaging in constitutionally protected conduct as described herein, and to prevent him from engaging in such conduct, specifically filing a complaint against the police, and for holding himself out as someone that protests government actors that engage in unlawful conduct.

211.     The conduct of these defendants would deter a person of ordinary firmness from continuing to engage in filing complaints against the police in the future.

212.     Defendant Salvaggio then used the charges to suggest to other local, state, and federal agencies that Plaintiff Miller was an agitator[12] that needed to be further investigated and prosecuted.

213.     Despite Defendant Salvaggio's extensive efforts to target Plaintiff Miller and his family, the charges brought against him were ultimately dismissed, because Defendants were without probable cause to bring these charges, and because Plaintiff Miller was innocent in that he did not bring a firearm into a courtroom.  Nonetheless, these Defendants acted with malice in that there was not purpose for pursuing the charges other than to quash Plaintiff Miller's First Amendment rights.

214.     Defendants' coordinated effort and conduct to have Plaintiff Miller prosecuted was done in retaliation and in an effort to prevent him from filing complaints against law enforcement agencies.

---

[12] Defendants describe Jack Miller and other First Amendment Auditors as "agitators" and attempt to associate them with individuals that commit mass murder and kill police officers.  Defendants lack any regard for Plaintiff's protections afforded under the United States Constitution.

215.    Plaintiffs suffered emotional injuries and pain, mental anguish, humiliation, and embarrassment, in addition to other harms, as a result of Defendants' collected and chilling conduct.

**COUNT VIII**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**(Failure to Intervene)**

216.    Plaintiffs incorporate herein all prior allegations.

217.    Plaintiffs assert this claim against Defendants Salvaggio, Saucedo, Anderson, Brooks, Gonzales, Tacquard, Vasquez, Wells, Munoz, and Rivera.

218.    Each of the above counts in this suit named Defendants, under color of law, were either working in concert with one another to deter Plaintiff Miller from engaging in constitutionally protected activity.

219.    Even if not all Defendant Officers acted in concert, none of the Defendant Officers intervened to stop the unlawful conduct of one or more of the acting Defendant Officers.

220.    Specifically, Defendants Salvaggio, Saucedo, Anderson, Brooks, Gonzales, Tacquard, Rivera, Wells, Munoz, and Vasquez were aware that Defendant King's affidavit for the warrant was false when it alleged that Plaintiff Miller had a real gun inside of a courthouse.  These defendants had an opportunity to prevent the harm but failed to do so when Defendant Officers executed the search and arrest warrants they knew was defective.  These officers acquiesced in the conduct.

221.    Defendants Salvaggio, Saucedo, Anderson, Brooks, Gonzales, Tacquard, Wells, Munoz, and Vasquez failed again to intervene when they observed officers holding Plaintiffs and minors at gunpoint during the unlawful raid.  Defendant Officers had a reasonable opportunity to

prevent the harm but failed to do so when they engaged in similar conduct or continued to execute the bad warrant.

222.    Plaintiffs suffered emotional injuries and pain, mental anguish, humiliation, and embarrassment, in addition to other harms, as a result of Defendants' collected and chilling conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment and pray for the following relief, jointly and severally, against all Defendants:

a.  Full and fair compensatory damages in an amount to be determined by a jury;

b.  Nominal damages for Defendants' retaliatory conduct that did not result in damages in excess of nominal damages;

c.  Punitive damages in an amount to be determined by a jury;

d.  Reasonable attorney's fees and the costs and disbursements of this action; and

e.  Any such other relief as appears just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable, pursuant to Fed. R. Civ. Pr. 38(b).

Respectfully Submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby affirm that on this 10th day of October 2022, that the foregoing document was filed with the Court's CM/ECF electronic filing system, and that a copy of said document was served upon all parties of record, via electronic service.

*/s/ Brandon J. Grable*