UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JACK MILLER, et al.;

   *Plaintiffs*,

v.                              **Case No.  SA-20-CV-00642-JKP**

CHIEF JOSEPH SALVAGGIO, et al.;

   *Defendants*.

## MEMORANDUM OPINION AND ORDER

Before the Court is the parties' cross motions for summary judgment. *See* ECF Nos. 86, 89. The parties filed responses and replies. *See* ECF Nos. 93, 94, 96, 97. After due consideration of the parties' briefings, the record evidence, and the applicable law, the Court finds the Defendant officers are entitled to qualified immunity and, therefore, **GRANTS** their motion for summary judgment on all counts. *See* ECF No. 86. The Court, accordingly, **DENIES** plaintiffs' motion for summary judgment (ECF No. 89) and **DISMISSES** this case.

## BACKGROUND

This case is a 42 U.S.C. § 1983 civil rights action in which Jack Miller, a Second Amendment activist, and members of his family, challenge the Defendant officers' arrest and prosecution of Miller, and the search of the family's home. In the early morning hours of June 1, 2018, officers executed search and arrest warrants at Miller's home, based on his alleged violation the day before of Texas Penal Code Section 46.03, for bringing a firearm into a court or an office utilized by a court. Miller was indicted by a grand jury for the offense, but the case was

later dismissed. Miller alleges the Defendant officers violated his Constitutional rights by retaliating against him for his protest activity. Miller's family members allege the Defendant officers violated their Fourth Amendment rights in executing a defective search warrant at their home. The Defendant officers argue they are entitled to qualified immunity because they had probable cause to believe Miller violated Texas Penal Code Section 46.03.

Miller's activism involves confronting government officials about purported violations of the law, often videotaping his interactions for publication on YouTube and Facebook under the handle "TX Sheepdog 72." *See* Defense Exh. P (Deposition Testimony of Jack Miller). On May 31, 2018, Miller and a companion named David Howd visited Leon Valley Municipal Building which houses, among other government offices, the Leon Valley Municipal Court. *Id*. Miller's stated purpose for visiting was to inform Leon Valley officials of his belief that the building's signs prohibiting weapons were unlawful. *Id*. Miller entered the building and encountered Officer Erika Rivera, who was stationed at the front door conducting security checks with a handheld metal detector wand. *See* Plaintiffs' Exh. 7 (Miller Video Footage). Miller asked Officer Rivera what types of offices were in the Municipal Building and, as she was listing offices, he interrupted her to ask if there was a court. *Id*. She confirmed there was a court. *Id*. Miller then explained he had come to register a complaint about the building's "illegal" weapons prohibited signs. *Id*. Officer Rivera asked Miller to step aside from the entrance, which he did, and said she would go find someone who could take his complaint. *Id*.

Officer Rivera walked into the building, around a reception desk, and into an internal waiting area where she began talking with Detective Jim Wells. *See* Plaintiffs' Exh. 30 (Howd Video Footage). Miller, who could hear their conversation from the front entryway, stepped inside to poke his head around the corner and announce to Detective Wells that he was the

person who asked to register a complaint. *Id*. Detective Wells approached Miller and upon noticing a holstered weapon on Miller's hip said, "Go ahead and step outside with your gun. It's a court day right now." *Id*. at 3:45. Miller complied and stepped outside, at which point Detective Wells reiterated, "You're not going to go back in there … court's being held." *Id*. at 4:02. The two men exchanged words and Detective Wells eventually walked away, telling Miller to file his complaint with the Attorney General's office and refusing to engage further. *Id*. Miller then spoke briefly with Lieutenant David Anderson, who had stepped outside. *Id*. Like Detective Wells, Lieutenant Anderson told Miller to file his complaint and refused to engage further. *Id*. Miller then turned to his companion, Howd, who was filming the interaction, and said "Let me go put my gun up and I'll go try it again." *Id*. at 6:02. Miller then placed his gun in the glove compartment of his car and returned to the Leon Valley Municipal Building to file his complaint.

At no point during his interactions with Officer Rivera, Detective Wells, and Lieutenant Anderson, did Miller say his holstered gun was fake. Indeed, in their depositions, all three officers testified they believed Miller was carrying an actual firearm. Video evidence depicts Miller openly carrying on his hip what appears to be a black handgun that is partially obstructed by a holster. *Id*. at 4:48. Miller now says the gun was a fake, rubber, blue training gun that he spraypainted black to make it look real. *See* Defense Exh. P (Deposition Testimony of Jack Miller). However, the Court finds insufficient evidence in the record to support Miller's contention that the gun he was carrying during his interaction with the Defendant officers was fake, nor does it find evidence the Defendant officers had reason to believe it was fake. Furthermore, the Court finds Miller's entry into the building's lobby was sufficient to support the officers' reasonable belief that Miller violated the statute. The Court, therefore, finds the

Defendant officers are entitled to qualified immunity because they had probable cause to believe Miller violated Texas Penal Code Section 46.03.

## LEGAL STANDARD

Summary judgment is appropriate if the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993).[1] "A fact is material only if its resolution would affect the outcome of the action." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). A genuine dispute for trial exists if the record taken as a whole could lead a reasonable trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010). Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact or the appropriateness of judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323; *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006). Furthermore, when the movant asserts a qualified immunity defense, that assertion "alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). In the context of summary judgment, governmental employees need only assert the defense in good faith. *See Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404,

---

[1] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.)

419 (5th Cir. 2008); *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007). They have no

burden "to put forth evidence to meet [their] summary judgment burden for a claim of immun-

ity." *Beck v. Tex. State Bd. of Dental Examiners*, 204 F.3d 629, 633–34 (5th Cir. 2000). Once a

governmental employee "invokes qualified immunity, the burden shifts to the plaintiff to

demonstrate the inapplicability of the defense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194

(5th Cir. 2009); *accord McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en

banc). The plaintiff "must rebut the defense" by establishing a genuine factual dispute as to

whether the "allegedly wrongful conduct violated clearly established law." *Brown*, 623 F.3d at

253.

Upon the shifting burden, "[u]nsubstantiated assertions, improbable inferences, and

unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v.

City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003); *see also Eason v. Thaler*, 73 F.3d 1322,

1325 (5th Cir. 1996). The party opposing summary judgment is required to identify specific

evidence in the record and to articulate the precise manner in which this evidence raises a

genuine dispute of material fact. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.

1998) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994)). Further, should the

nonmoving party fail "to address or respond to a fact raised by the moving party and supported

by evidence, the court may consider the fact as undisputed" and "[s]uch undisputed facts may

form the basis for a summary judgment." *Broadcast Music*, *Inc. v. Bentley*, SA-16-CV-394, 2017

WL 782932, at *2 (W.D. Tex. Feb. 28, 2017).

In determining the merits of a motion for summary judgment, a court has no duty to

search the record for material fact issues or to find a party's ill-cited evidence. *Hernandez v.

Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012); *Ragas*, 136 F.3d at 458. In addition, a

court may not make credibility determinations or weigh the evidence and must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

When versions of events differ, the Court is "required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion. In qualified immunity cases, this usually means adopting … the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the Court is not required to credit the plaintiff's version when that version is contradicted by unambiguous video evidence; instead, it should view the facts "in the light depicted by the videotape." *Id.* at 380–81. While a court may not ordinarily weigh credibility at summary judgment, it may assign greater weight to "facts evident from the video recordings taken at the scene." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016).

## APPLICABLE LAW

### I.    Section 1983

"Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). "[T]here can be no § 1983 liability unless the plaintiff has "suffered a constitutional violation … at the hands of … a state actor." *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 867 (5th Cir. 2012). Accordingly, for a § 1983 claim to survive, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was

committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Sanchez v. Oliver*, 995 F.3d 461, 466 (5th Cir. 2021).

## II.   Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established … constitutional rights of which a reasonable person would have known.'" *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017). When qualified immunity is asserted by a law enforcement officer, the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001)). When determining whether an official can claim qualified immunity, courts typically engage in a two-step analysis. *Griggs*, 841 F.3d at 312. "First, they assess whether a statutory or constitutional right would have been violated on the facts alleged." *Id.* (citing *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)). "Second, they determine whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* However, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. The Fifth Circuit requires that the law "so clearly and unambiguously prohibited the violative conduct that '*every* reasonable official would understand that what he is doing violates the law.'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011); *accord Estate of Bonilla v. Orange Cty.*, 982 F.3d 298 (5th Cir. 2020). The Supreme Court "does not require a case directly on point … but existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

III.     *Franks* **Liability**

In this case, Plaintiffs assert the clearly established right to be free from search or seizure without a good faith showing of probable cause. *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018). Further, it is clearly established that a warrant is not evidence of probable cause "if (1) the affiant, in support of the warrant, includes 'a false statement [made] knowingly and intentionally, or with reckless disregard for the truth' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *Id*. (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)). In the § 1983 context, liability not only attaches to affiants but also "officers who deliberately or recklessly provide false, material information for use in an affidavit or who make knowing and intentional omissions that result in a warrant being issued without probable cause may still be held liable." *Mayfield v. Currie*, 976 F.3d 482, 487 (5th Cir. 2020).

IV.     **Retaliatory Prosecution**

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim. *Id*. In retaliatory prosecution claims, plaintiffs must plead and prove the absence of probable cause for the underlying criminal charge. *Id*. at 265–266.

### DISCUSSION

This case centers around Second Amendment activist Jack Miller's May 31, 2018 protest activity at the Leon Valley Municipal Building and Defendant officers' resulting search, arrest, and prosecution of Miller for violating Texas Penal Code Section 46.03. Miller's companion at

the Leon Valley Municipal Building, David Howd, is not a party to the case but is noteworthy because he recorded Miller's protest activity that day and discussed events with Miller on camera as they were unfolding. The remaining plaintiffs are Miller's family members—Annabel Campbell, Lisa Pesina, Matthew Pesina, and minors M.P. and J.G.—who were present on June 1, 2018 when officers executed a search warrant at their home. The Defendant officers argue Miller's family members should be dismissed because they abandoned their excessive force, malicious prosecution, and failure to intervene claims. While it is true that Miller's family members cannot assert claims based on violations of Miller's civil rights, they can claim their own rights were violated by a defective search warrant. The Court, therefore, addresses Miller's family members' claims in its analysis of the search warrant's validity.

The parties disagree as to which Defendant officers are still in the case. Plaintiffs originally named Chief Joseph Salvaggio, Detective Jim Wells, Lieutenant David Anderson, Captain Ruben Saucedo, Officer Johnny Vasquez, and State Police Officer John Doe. *See* ECF No. 1. Plaintiffs then attempted to add Officers Andy Greigo, Michael Tacquard, and Eddie Gonzales but later voluntarily dismissed them for lack of service. *See* ECF No. 77. Defendants further argue Officers Terry Brooks, Alex King, Rudolfo Munoz, and Erika Rivera should be dismissed because they were added after the statute of limitations expired. Indeed, the statute of limitations is two years and Officers Brooks, King, Munoz and Rivera were added in Plaintiffs' Amended Complaint on September 10, 2020, more than two years and three months after the May 31, 2018 and June 1, 2018 events which gave rise to this lawsuit. *See* ECF No. 13. Defendants correctly note that changing Defendant officers from a John Doe to a named individual does not qualify as a mistake allowing the amendment to relate back to the original complaint. *See Balle v. Nueces City*, 952 F.3d 552, 558 (5th Cir. 2017). While the Court finds

this argument compelling, it need not dismiss Defendant officers on this theory because it finds they are entitled to qualified immunity.

Based on the record evidence, the officers whose activities are most relevant to the Court's analysis are Sergeant Gonzalez and Detective King, who worked together on the probable cause affidavits for the arrest and search warrants; Officer Rivera, who was working security when Miller entered the Leon Valley Municipal Building on May 31, 2018; and Detective Wells and Lieutenant Anderson, who interacted with Miller while he was still wearing his holstered gun.

Plaintiffs' third amended complaint, which is the live pleading, brings eight counts against the Defendant officers. *See* ECF No. 54. Prior to the dispositive motion deadline, Plaintiffs voluntarily dismissed three counts. *See* ECF No. 85. The remaining counts are: retaliatory arrest (Counts I, II); unlawful entry (Count III); unlawful search (Count IV); and retaliatory prosecution (Count VII). To succeed on their claims related to Miller's arrest and the search of his home under Counts I, II, III, and IV, Plaintiffs must overcome the Defendant officers' good faith showing of probable cause. *Winfrey*, 901 F.3d at 494. To succeed on their retaliatory prosecution claim (Count VII), Plaintiffs must plead and prove the absence of probable cause for the underlying criminal charge. *Hartman*, 547 U.S. at 265–266. The dispositive question on all remaining counts, therefore, is whether the Defendant officers had probable cause to believe Miller violated Texas Penal Code Section 46.03.

Probable cause is a "'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). It turns "'on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of

legal rules.'" *Id.* at 371 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Instead, courts must look to the "totality of the circumstances" and decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer" demonstrate "a probability or substantial chance of criminal activity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586, 588 (2018). But while "[p]robable cause 'is not a high bar,'" *id.* at 586, "the belief of guilt must be particularized with respect to the person to be searched or seized." *Pringle*, 540 U.S. at 371.

Section 46.03 of the Texas Penal Code provides that "(a) A person commits an offense if the person intentionally, knowingly, or recklessly possesses or goes with a firearm … (3) on the premises of any government court or offices utilized by the court…" Section 46.01(3) defines a "firearm" as "any device designed, made, or adapted to expel a projectile through a barrel by using  the energy generated by an explosion or burning substance or any device readily convertible to that use." Section 46.03(c)(4) defines "premises" as "a building or a portion of a building." It further notes that "[t]he term does not include any public or private driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area."

Plaintiffs proffer three theories upon which they say the Court should find the Defendant officers lacked probable cause to believe Miller violated Texas Penal Code Section 46.03. First, they say Miller was carrying a fake weapon when he entered the Leon Valley Municipal Building on May 31, 2018, and he therefore did not have a "firearm" in violation of Texas Penal Code Section 46.03. Second, they say that because Miller stayed near the front entryway to the Leon Valley Municipal Building after encountering Officer Rivera at the security desk, he was never on the "premises" of a court or its offices in violation of Texas Penal Code Section 46.03. Finally, Plaintiffs argue that because the Leon Valley Municipal Building is used for multiple

government functions, it is not a "court or offices utilized by the court" under Texas Penal Code Section 46.03. The Court considers each of these arguments, in turn, below.

I.       **The Firearm**

Plaintiffs argue Miller did not violate Texas Penal Code Section 46.03 because he was not carrying a "firearm" within the definition of the statute. They say the gun Miller brought into the Leon Valley Municipal Building was a fake, rubber, blue training gun that Miller spraypainted black. Miller offers no evidence the gun he wore during his encounter with officers on May 31, 2028 was fake other than his "unsubstantiated assertions," which are insufficient evidence to overcome a summary judgment challenge. *Brown*, 337 F.3d at 541. What his testimony makes clear, however, is that even if the gun was fake, he painted it black so people would think it was real. *See* Defense Exh. P (Deposition Testimony of Jack Miller) at 110. When asked, "So you actually painted that blue gun black so that it would look like a Glock?" Miller responded, "No criminal or bad dude out there is going to believe it's real if it's blue, so yeah." *Id*. If the gun was fake, Miller successfully tricked the Defendant officers into thinking it was real. All of the officers who interacted with Miller when he first entered the Leon Valley Municipal Building—Officer Rivera, Detective Wells, and Lieutenant Anderson—testified they believed Miller was carrying an actual firearm. *See* Defense Exh. K (Deposition Testimony of Officer Erika Miller) at 16–19; Defense Exh. M (Deposition Testimony of Detective Jim Wells) at 8–12; Defense Exh. J (Deposition Testimony of Lieutenant David Anderson) at 53–58.

While their deposition testimony provides some evidence of the officers' subjective belief that the gun was real, the Court assigns greater weight to "facts evident from the video recordings taken at the scene." *Griggs*, 841 F.3d at 312. Here, video evidence depicts Miller openly carrying on his hip what appears to be a black handgun that is partially obstructed by a

holster. *See* Plaintiffs' Exh. 30 (Howd Video Footage) at 4:48. The video evidence is not sufficient to determine whether the gun is real; however, it is sufficient to establish the Defendant officers were objectively reasonable in so believing.

Furthermore, the video evidence shows that at no point during his interactions with the officers did Miller say his holstered gun was fake. To the contrary, Miller made statements suggesting the gun was real. For instance, when Detective Wells told Miller to step outside with his gun, Miller complied and did not say anything about the gun being fake. *See* Plaintiffs' Exh. 30 (Howd Video Footage) at 3:45. To the contrary, once the men were outside and Detective Wells restated that Miller could not enter the building with a gun, Miller started arguing with Detective Wells about repeating himself, saying "I heard you when you said get out with the gun." *Id*. That would have been an opportune time for Miller to tell Detective Wells the gun was fake, but he never did so. Instead, after Detective Wells left, Miller had a brief conversation with Lieutenant Anderson, then turned to Howd and said he was going to put his gun in the car, again referring to it as a "gun" and not a fake gun. *Id*. Plaintiffs argue the Defendant officers should have searched Miller on the scene to determine if the gun was real, or, if they believed he violated Texas Penal Code Section 46.03, arrested him on the spot. But the officers had no reason to believe the gun was fake, and Lieutenant Anderson later testified that he decided to obtain a warrant before arresting Miller to avoid confrontation. *See* Defense Exh. J (Deposition Testimony of Lieutenant David Anderson) at 60.

Plaintiffs allege Miller announced the gun was fake loud enough for officers to hear, but the video evidence does not support that assertion. After Miller put his gun in his car, he returned to the Municipal Building to file a complaint. While Miller was filling out his complaint at the reception area, Howd told Miller they were being "stared down" by officers on the other side of a

glass window. *See* Plaintiffs' Exh. 13 (Howd Video Footage) at 4:30. Miller responded that he had received a text message saying Leon Valley officers were talking internally about whether they could arrest him for bringing a gun into the building. *Id*. Miller then said to Howd, "I'll let 'em arrest me, go out to the car to retrieve the gun, they're gonna find out it's a rubber gun. They can take the handcuffs off and maybe then they'll talk." *Id*. The Court takes no position on whether Miller's statements about the text message and the rubber gun were true, however, they do offer evidence of Miller's subjective belief that officers thought the gun he was carrying was real. Furthermore, there is no evidence that officers heard Miller's statement to Howd about the gun being fake. Though there were officers nearby, Miller was not addressing them directly. Miller was talking to Howd in a conversational tone, in a busy reception area full of other people and background noises.

Plaintiffs argue the gun recovered at Miller's home, a black and silver Glock, could not have been the gun holstered on Miller's hip at the Leon Valley Municipal Building, which appears to be all black. They further point to Officer Rivera's testimony that the black and silver Glock that was recovered was not the same gun she saw Miller wearing. *See* Defense Exh. K (Deposition Testimony of Officer Erika Rivera) at 55. While this detail is some evidence that the gun recovered at Miller's home was not the gun he wore at the Leon Valley Municipal Building, it does not rule out the possibility that he was wearing a different, real gun. Therefore, the Plaintiffs do not present evidence which raises a genuine dispute of material fact to undermine the officers' belief that the gun was real. The video evidence of the encounter unambiguously shows that officers were reasonable in believing Miller was carrying a real gun at the Leon Valley Municipal Building. Plaintiffs further assert that in executing the search warrant, officers neglected to take into evidence a fake rubber gun that was left in the glove compartment of

Miller's car. Here again, Plaintiffs rely on Miller's "unsubstantiated assertions," which are insufficient evidence to overcome a summary judgment challenge. *Brown*, 337 F.3d at 541. That being said, the mere existence of the rubber gun does not establish that it was the gun Miller was carrying at the Leon Valley Municipal Building, nor does it create a fact issue as to officers' reasonable belief that the gun was real.

After considering the totality of the circumstances, the Court finds Miller has not presented any evidence that the officers had reason to believe he was carrying a fake gun. To establish *Franks* liability, the legally relevant question is not whether Miller was carrying a real gun, but rather, whether the Defendant officers "knowingly and intentionally, or with reckless disregard for the truth" falsely stated that Miller was wearing a real gun. *Franks*, 438 U.S. at 155–56. Because the Court finds no evidence the Defendant officers made such false statements, Plaintiffs' challenge to the arrest and search warrant affidavits based on officers' characterization of the gun fails. Likewise, Plaintiffs' retaliatory prosecution claim fails because officers established probable cause for the underlying criminal charge based on their objectively reasonable belief that the gun was real. *Hartman*, 547 U.S. at 265–266. The Court finds Defendants did not violate the Plaintiffs' constitutional rights regarding these claims.

## II.     The Premises

Plaintiffs argue that because Miller stayed near the front entryway to the Leon Valley Municipal Building after encountering Officer Rivera at the security desk, he was never on the "premises" of a court or its offices in violation of Texas Penal Code Section 46.03. Section 46.03(c)(4) defines "premises" as "a building or a portion of a building." It further notes that "[t]he term does not include any public or private driveway, street, sidewalk or walkway, parking lot, parking garage, or other parking area." The video evidence conclusively establishes that

Miller entered the Leon Valley Municipal building, through two sets of doors, past signs saying weapons are prohibited, before encountering Officer Rivera at security. *See* Plaintiffs' Exh. 7 (Miller Video Footage). He did comply with Officer Rivera's request to step to the side and wait while she went to find someone to take his complaint. *Id*. However, at that point, Miller was already on the "premises" within the meaning of the statute. He was in the building, as distinguished from an outside driveway, street, sidewalk, parking lot, etc. Furthermore, when Officer Rivera was talking to Detective Wells, Miller stepped further into the building to announce that he was the person who came to register a complaint. *Id*. The Court, therefore, finds conclusive evidence to establish that Miller was inside the building sufficient to give rise to Texas Penal Code Section 46.03 liability and Plaintiffs' "premises" argument fails.

### III.    The Court and Its Offices

Finally, Plaintiffs argue that because the Leon Valley Municipal Building is used for multiple government functions, it is not a "court or offices utilized by the court" subject to Texas Penal Code Section 46.03. Here, Plaintiffs invite the Court to engage in statutory interpretation to answer the question Miller raised when he visited the Leon Valley Municipal Building on May 31, 2018. According to Plaintiffs' interpretation of the law, the portions of the Leon Valley Municipal Building that are not used by the Leon Valley Municipal Court are not subject to Texas Penal Code Section 46.03 and weapons are therefore not prohibited. This Court need not answer that question, however, because the legally relevant question in this case is whether the Defendant officers were reasonable in believing Texas Penal Code Section 46.03 applied to the Leon Valley Municipal Building. The officers' reasonable belief was established by undisputed videotape evidence showing signs posted outside the building saying weapons were prohibited. Furthermore, the officers' belief was validated when the magistrate judge signed the arrest and

16

search warrants, and the grand jury returned an indictment charging Miller with violating Texas Penal Code Section 46.03 by bringing a weapon into the Leon Valley Municipal Building. *See* Defense Exh. C (Probable Cause Affidavits for Search Warrant and Arrest Warrant); *see also* Defense Exh. G (Indictment of Jack Miller). Plaintiffs' statutory argument, therefore, fails.

## CONCLUSION

In conclusion, the Court finds the Defendant officers had probable cause to believe Miller violated Texas Penal Code Section 46.03. Because Plaintiffs fail to create a genuine dispute of material fact as to the Defendant officers' good faith showing of probable cause, their claims related to Miller's arrest and the search of his home under Counts I, II, III, and IV fail. *Winfrey*, 901 F.3d at 494. Likewise, because Plaintiffs fail to plead and prove the absence of probable cause for Miller's underlying criminal charge, their retaliatory prosecution claim under Count VII fails. *Hartman*, 547 U.S. at 265–266. Plaintiffs fail to establish a genuine factual dispute as to whether the Defendant officers violated clearly established law. *Brown*, 623 F.3d at 253. Specifically, the Court finds insufficient summary judgment evidence to support Plaintiffs' suggestion, under the first prong of the qualified immunity analysis, that Defendant officers violated a statutory or constitutional right. *Griggs*, 841 F.3d at 312. That finding necessarily leads to the conclusion, under the second prong, that the Defendant officers' actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id*. The Court, therefore, finds the Defendant officers are entitled to qualified immunity and summary judgment as a matter of law.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Partial Summary Judgment is **DENIED**. *See* ECF No. 89.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**. *See* ECF No. 86. This case is **DISMISSED**. Final Judgment will be entered by separate order.

It is so ORDERED.
SIGNED this 23rd day of August, 2023.

_____
JASON  PULLIAM
UNITED STATES DISTRICT JUDGE

18